BLUE RIBBON FEED COMPANY, INC., Plaintiff-Appellee, Cross-Appellant,

v.

FARMERS UNION CENTRAL EX-CHANGE, INC., Defendant-Appellant, Cross-Appellee.

Nos. 82–2796, 82–2881 and 83–1547.

United States Court of Appeals, Seventh Circuit.

Argued Dec. 1, 1983.

Decided April 6, 1984.

As Corrected April 13, 1984.

Eugene M. Bond, Eugene M. Bond & Associates, Washington, D.C., for defendant-appellant.

Gaar W. Steiner, Michael, Best & Friedrich, Milwaukee, Wis., for plaintiff-appellee.

Before PELL and BAUER, Circuit Judges, and MAROVITZ, Senior District Judge.*

PELL, Circuit Judge.

In this diversity case, Farmers Union Central Exchange, Inc. (CENEX) appeals from the judgment of the district court granting Blue Ribbon Feed Company, Inc. (BRF) monetary and injunctive relief under Wisconsin law for trade name infringement. BRF cross-appeals, contending that the monetary and injunctive relief are inadequate redress.

* Abraham L. Marovitz, Senior District Judge of the Northern District of Illinois, sitting by desig- nation.

## I. FACTS

The background of this dispute starts in the year 1951, when the Sather family purchased the Doughboy farm products retail store in New Richmond, Wisconsin. The Sathers changed the name of the store to Blue Ribbon Feed Company and commenced business selling agricultural products, in particular dairy animal feeds, to members of the neighboring farming communities in Wisconsin and Minnesota. Most products sold by the Sathers were labeled with the name of the actual producer, but some were also sold under the store's own Blue Ribbon label. In 1951, the Blue Ribbon retail store had gross sales of approximately $225,000. The turnover of products sold under the Blue Ribbon label constituted approximately ten percent of gross sales. By 1981, the store's gross sales reached $3,500,000, of which approximately $700,000 was attributable to products sold under the name Blue Ribbon. Since 1951, BRF has advertised its trade name and palette of products in various media, including periodicals, trade publications, and radio. It has concentrated its advertising in the area surrounding New Richmond, and it has allocated progressively larger sums each year for such advertising, starting with $1000 in 1951 and reaching $15,000 in 1981.

CENEX is a Minnesota corporation with its principal place of business in South St. Paul, Minnesota. It does business in thirteen states across the northern tier of the United States, selling farm products through a network of affiliated cooperatives. There are 112 CENEX cooperatives in Wisconsin. At least twenty-eight of these and an additional seven in Minnesota are located within a fifty-mile radius of BRF's store in New Richmond. In 1968, CENEX began marketing certain of its products under the name "Blue Ribbon," a designation it chose to signify products of the highest quality. Between 1968 and 1971, CENEX confined sales of Blue Ribbon feed products to Wisconsin. After 1971, it sold no more than $50,000 worth of Blue Ribbon feed products annually outside of Wisconsin. Its total sales volume for Blue Ribbon feed products in Wisconsin grew from $2600 in 1968 to $5,250,000 in 1980. CENEX has advertised its Blue Ribbon products in Wisconsin in specialized publications and on the radio as well as television. It has also provided its local affiliates with advertising slicks, to which the affiliates append their name and which they then run in publications covering local trade areas. CENEX has increased its annual advertising budget for its Blue Ribbon products from five dollars in 1968 to $34,-000 in 1981, with the most marked increases coming in the years 1980 and 1981.

According to the Sathers, they became aware in the winter of 1978 that CENEX marketed products under the name Blue Ribbon. Early in 1980, the Sathers brought suit in the Circuit Court of Dane County, Wisconsin, seeking relief for CENEX's infringement of the Blue Ribbon trade name. The complaint alleged a cause of action under Wisconsin law and asserted no rights under either Minnesota law or the federal Lanham Act.[1] CENEX removed to federal court, where the district court entertained BRF's motion and CENEX's cross-motion for summary judgment. By decision and order dated March 9, 1982, the district judge denied CENEX's motion to strike certain affidavits submitted by BRF, and it rendered summary judgment, interlocutory in character, in favor of BRF on the issue of liability alone. On August 30, 1982, the district court commenced trial on the issues of laches, damages, and injunction. In findings of fact and conclusions of law filed October 12, 1982, the district judge determined, *inter alia*, that CENEX had profits from the sales of Blue Ribbon products in the area within a twenty-mile radius of the BRF store, excluding Minne-

---

[1] On May 14, 1982, almost two-and-one-half years after BRF filed its complaint alleging a cause of action solely under Wisconsin law, BRF filed a motion to consider the complaint amended to plead a cause of action under the federal Lanham Act. The trial court properly denied the motion. The issues connected with the federal cause of action were not tried with the implicit or explicit consent of the parties. *See* Fed.R.Civ.P. 15(b).

sota, of $114,999, which it awarded to BRF as damages. The district judge also issued an injunction prohibiting CENEX from selling, distributing, or advertising any of its animal feed products under the name Blue Ribbon in that part of Wisconsin within a twenty-mile radius of the BRF store. Final judgment was entered accordingly.

The instant appeal and cross-appeal present four principal issues: (1) Whether the district court erred when it granted BRF summary judgment on the issue of liability; (2) whether BRF is entitled to damages, and if so if the damages found by the district court are adequate; (3) whether the twenty-mile restriction is the proper geographical scope for the injunction; and (4) whether BRF is entitled to attorney's fees. We address each issue in turn.

## II. DISCUSSION

A. The Propriety of the District Court's Rendering Summary Judgment on the Issue of Liability

1. The Elements of a Trade Name Infringement Action under Wisconsin Law

■ CENEX argues at the outset that BRF has merely asserted rights in its trade name, that a trade name is legally distinct from a trademark, and that under the law of Wisconsin governing the former, the district court improperly granted BRF summary judgment. CENEX's argument is based on the traditional common law rule that in cases alleging misuse of a trade name, as opposed to a trademark, the plaintiff must prove the defendant's intent to deceive prospective purchasers. *See Vredenburg v. Safety Devices Corp.*, 270 Wis. 36, 41, 70 N.W.2d 226, 230 (1955). CENEX contends that the district court erred when it rendered summary judgment in BRF's favor because BRF never established defendant's fraudulent intent. Recent decisions of the Wisconsin Supreme Court, however, undercut CENEX's position. In *First Wisconsin National Bank v. Wichman*, 85 Wis.2d 54, 270 N.W.2d 168 (1978), the Supreme Court of Wisconsin expressly

adopted Restatement (Second) of Torts §§ 715–717 (Tent. Draft No. 8, 1963) as the common law of Wisconsin. *See also Hirsch v. S.C. Johnson & Son, Inc.*, 90 Wis.2d 379, 399–400, 280 N.W.2d 129, 139 (1979) (affirming continued vitality of *First Wisconsin, supra*). The Restatement (Second) took the position that adoption and use of a trade name gives rise to the right to bring an infringement action. Comment a to Section 717 explains:

> The weight of the authority ... supports the proposition that if a tradename has acquired distinctiveness, or secondary meaning, and thus identifies a particular business entity, the user of such tradename is entitled to protection against infringement of that tradename in the same manner and to the same extent as the user of a trademark which has acquired secondary meaning ....

■ CENEX next contends that even if BRF was not obligated to show fraud, it failed to establish the absence of a genuine triable issue regarding the other elements necessary under Wisconsin law to prevail in an action for trade name infringement. In *First Wisconsin, supra*, the Supreme Court of Wisconsin cautioned that the mere use of a trade name does not lead automatically to exclusive rights in that name. Rather, to be entitled to prevent others from using a name, "it is necessary [for the plaintiff] to show that the effect of the use has been to identify the particular business entity and to distinguish it from others and that the actor's use is likely to cause confusion and deception." *Id.* 85 Wis.2d at 63, 270 N.W.2d at 172, *quoting* Restatement (Second) of Torts § 717 comment a (Tent. Draft No. 8, 1963). Accordingly, in assessing the correctness of the grant below of summary judgment on the issue of liability, we must determine whether the district court properly found no genuine triable issue regarding the following facts: (1) Blue Ribbon identifies BRF's business and distinguishes it from others, and (2) CENEX's later use of the name Blue Ribbon is likely to cause confusion and deception.

## 2. The Affidavits and the Absence of a Genuine Issue of Material Fact

The district court principally relied on the pleadings and affidavits of farmer-customers to determine the absence of a genuine issue as to either of the two material facts in this case. Each of the seven affidavits submitted by BRF in support of its motion for summary judgment follows the same four-paragraph format. Paragraph one recites that the affiant is a farmer in the New Richmond area and has been engaged in the farming business for close to a decade, and in some instances longer. The second and third paragraphs state that the farmer has purchased Blue Ribbon products from BRF for numerous years and that he strongly associates the name Blue Ribbon with BRF. In the fourth paragraph, each farmer declares that he had difficulty identifying the Blue Ribbon name with BRF once CENEX began to advertise its Blue Ribbon products. For example, affiant Stephens states: "I have been confused by the Blue Ribbon advertising used by someone else in the area. I thought they were selling Blue Ribbon Feed Company feed. I was confused on where or what was the Blue Ribbon 40 percent concentrate."

CENEX contends that it could survive summary judgment without submitting to the trial court evidentiary matter to oppose the affidavits submitted by BRF. We find CENEX's argument unpersuasive. The purpose of summary judgment is to force the parties to show the court that trial would serve a meaningful purpose. We believe BRF made a threshold showing that it could establish at trial the facts entitling it to relief under state law. It accordingly was incumbent on CENEX to place before the court some evidentiary matter and convince the court that factual issues were genuinely in dispute. Absent any action on the part of CENEX, the court was correct to preempt a trial.

Had the case gone to trial, it would have been necessary for BRF to show that members of the relevant consuming public associated the name Blue Ribbon with the Sath-

ers' Blue Ribbon Feed Company. The submitted affidavits containing the statements of dairy farmers in the New Richmond area showed that as a preliminary matter there was consumer identification among those in the market to purchase animal feed products in the area around New Richmond. BRF also would have had to show that these consumers would likely be confused by CENEX's use of the name. The Stephens affidavit revealed that CENEX's advertising led him to believe that he could obtain BRF's product at the CENEX outlet. This is precisely the type of confusion that the Supreme Court of Wisconsin has held to be actionable under the state's law of trade name infringement. *See Hirsch v. S.C. Johnson & Son, Inc.,* 90 Wis.2d 379, 401, 280 N.W.2d 129, 139 (1979) (citing Restatement (Second) of Torts § 717 to the effect that an actor infringes another's trade name if he uses the name in a manner likely to "cause prospective purchasers to believe that the actor's goods or services emanate from the same source as the other's goods or services"). We are aware that BRF produced only seven affidavits to establish the identification and confusion necessary under state law to prevail in a trade name infringement action. It could very well be the case that these seven affiants were the only dairy farmers in the entire New Richmond area who associated the name Blue Ribbon with the BRF company. For that matter, it might have been abundantly clear to every other prospective purchaser in the vicinity that CENEX's Blue Ribbon products were unconnected with the Sathers' products. The point is that it was incumbent on CENEX to produce evidence that BRF's affiants were unrepresentative consumers and thereby convince the trial court that there was a genuine triable issue. CENEX failed to produce any such evidence, and this failure properly led to CENEX's losing its case on summary judgment.

We are not unmindful of the fact that BRF's affidavits were suspiciously similar in format. We recognize that there are cases in which the movant will fail to establish the absence of a triable issue because

his submitted affidavits are inherently unreliable. The affidavits submitted to the district court in the instant case, however, do not fall into the category of inherently unreliable documents. We agree that the affidavits would have been more convincing as documents originating with the individual affiants had they each had a distinctive format. Nevertheless, the mere fact that the affidavits share a common format does not by itself convince us that the affiants signed their names to pre-prepared and manifestly false affidavits.

### B. The District Court's Order of Relief

Following determination of CENEX's liability for trade name infringement, the district court held a separate evidentiary hearing to determine appropriate relief. The evidence adduced at that hearing together with evidence submitted pursuant to the court's supplemental order led the court to fashion both monetary and injunctive relief. CENEX contends that the relief is inappropriately harsh, while BRF disputes that the relief is adequate to remedy the harm it has suffered.

■ We first consider CENEX's claim that neither an accounting for profits nor injunctive relief was appropriate because it had established the defense of laches. CENEX began using the words "Blue Ribbon" in 1968 to distinguish its highest quality products. For twelve years, according to CENEX, BRF waited quietly as CENEX funded an increasingly expensive advertising campaign and accumulated ever greater profits. It was only in 1980, after unreasonable and inexcusable delay, that BRF brought suit. The district court ruled against CENEX on the issue of laches after considering documentary evidence as well as the oral testimony of Irvin Sather who has presided over the day-to-day operations of BRF since 1951. The documentary evidence makes plausible the Sathers' claim that prior to 1978 they had no actual notice of CENEX's infringing use. Between 1968 and 1974, CENEX's annual budget for promoting Blue Ribbon products in Wisconsin and Minnesota was under $800. In 1975 and 1976, CENEX spent $1300 and $2500 respectively, and in 1977 CENEX spent no money at all to promote Blue Ribbon products. Sather testified that he and his employees had little or no contact with the neighboring CENEX outlet and that he had not seen CENEX Blue Ribbon products in the course of carrying on his business prior to 1978. The trial judge made an express factual finding that Sather's testimony was credible, and absent inherent improbability this Court will not disturb a district court's finding on an issue of credibility. *See United States v. Grabiec*, 563 F.2d 313 (7th Cir.1977). There was an additional delay of approximately eighteen months between the Sathers' learning of CENEX's infringing use in the winter of 1978 and their writing a cease and desist letter to CENEX on October 31, 1979. The trial judge found this delay insufficient to establish the defense of laches. The determination whether the delay was so unreasonable, inexcusable, and prejudicial to the defendant as to bar the plaintiff's remedies rested in the sound discretion of the trial judge. *See Baker Manufacturing Co. v. Whitewater Manufacturing Co.*, 430 F.2d 1008, 1009 (7th Cir.1970), *cert. denied*, 401 U.S. 956, 91 S.Ct. 978, 28 L.Ed.2d 240 (1971). Our search of the record reveals some evidence that during the eighteen months plaintiff was seeking legal counsel and assessing its rights to exclusive use. Although we would have preferred a more developed record on this point, we cannot find the "clear abuse" which is necessary to disturb the district judge's determination on the elements of the laches defense. *Id.*

■ We next consider the challenges made by both parties to the district court's award of monetary relief. CENEX argues that the district judge erred when he calculated damages based on CENEX's profits from the sale of Blue Ribbon products in the New Richmond area for the period beginning in 1980. It was necessary for BRF, in CENEX's view, to prove by competent evidence its actual damages; absent a showing that it actually lost trade because

of CENEX's infringing use, BRF was not entitled to monetary relief. The Supreme Court of Wisconsin, however, has taken the position that in cases "involving the wrongful use of trade-names and trade-marks, the profits of the wrongdoer may constitute the plaintiff's measure of damages." *Culligan, Inc. v. Rheaume*, 268 Wis. 298, 311, 67 N.W.2d 279, 285 (1955). That case does not articulate precise criteria for when a court should apply this remedy, yet it is evident from the facts and wording of *Culligan* that an accounting is proper under Wisconsin law as an indirect measure of the injury the plaintiff incurred because of the diversion of trade to the defendant. This would comport with one of the principal justifications for ordering an accounting. *See* 4 R. Callmann, The Law of Unfair Competition Trademarks and Monopolies § 22.49 (4th ed. 1983). Requisite to an award of the defendant's profits under the theory of diverted trade, however, is a finding that plaintiff and defendant were in competition.

■ We believe that BRF and CENEX began competition above a de minimus level starting in the year 1980. Prior to 1979, CENEX's advertising budget for Blue Ribbon products amounted to under $5000 annually, and by BRF's own admission, CENEX decidedly limited that advertising to internal cooperative publications. Since little of the advertising was directed at members of the consuming public, we do not believe that BRF is entitled to CENEX's profits for the sale of Blue Ribbon products prior to 1979. In the year 1979, CENEX's advertising budget increased marginally over the previous level, but in 1980 CENEX markedly accelerated its promotion of Blue Ribbon products, increasing its advertising budget from $5000 to $12,000 in that year. In the succeeding year, CENEX almost tripled its prior annual advertising budget, with total expenditures for advertising reaching slightly under $34,000 annually. Our reading of the record leads us to conclude that 1980 marked the beginning of direct competition between BRF and CENEX, and under the diversion of trade rationale for awarding profits, BRF's recovery should be limited to post-1979 profits.

■ The parties also challenge the geographical limitation on the award of profits, the district court having limited relief to defendant's profits attributable to sales to customers within a twenty-mile radius of New Richmond, BRF's proven trade area. BRF maintains that the trial court should not even have heard evidence concerning the geographical scope of the competition between BRF and CENEX because the parties stipulated in a joint pretrial report to competing in an area within a seventy-five-mile radius of the BRF store in New Richmond. The stipulation, however, does not specifically address the geographical boundaries of the BRF–CENEX trade competition. The stipulation merely states that CENEX has outlets within a seventy-five-mile radius of BRF's store. The trial court was correct to determine whether prospective purchasers located near a CENEX cooperative would travel a considerable distance in order to purchase from the BRF outlet. The stipulation also states that CENEX "overlaps [BRF's] trade area." This statement, however, does not identify the scope of BRF's trade area. Accordingly, the trial judge could not determine the geographical boundaries of the BRF–CENEX trade competition from the stipulation alone, and he appropriately heard evidence on the point.

The parties next challenge the figure of twenty miles as the correct radius of BRF's proven trade area. Predictably, BRF argues that the twenty-mile radius is too limited, while CENEX characterizes it as too wide. The determination that BRF's trade area extended only twenty miles from its outlet is a factual finding, and we will not disturb that finding unless our reading of the record shows it to be clearly erroneous. At trial on the issue of damages, Sather testified that BRF's primary trade area extended roughly to a fifty-mile radius, yet his recollection of sales to customers at even a thirty-mile radius was wanting in detail. Dairy farmer Bolkert testified that the farthest he would travel

to buy feed products for his farming business was only three miles. CENEX employees Weisenbeck and Ruemmele testified that they have feed products transported to customers twelve to fifteen miles away. As a practical matter, they do not ship products to customers located more than twenty miles from a CENEX outlet. In light of this testimony, and in light of the presence of numerous outlets in the New Richmond area, we can detect no clear error in the district court's determination.

BRF mounts a further challenge, contending that the district court erred by excluding territory in Minnesota when it calculated CENEX's profits attributable to Blue Ribbon sales in the area within a twenty-mile radius of New Richmond, Wisconsin. In excluding the Minnesota territory, the district court reasoned that BRF had asserted rights neither under federal law nor under Minnesota law, and that the rights BRF acquired under Wisconsin law should be limited in application to territory within the borders of Wisconsin. We recognize that this court has on occasion upheld injunctions which prohibited defendants from out-of-state infringement of exclusive rights acquired by plaintiffs under domestic law. See Polaroid Corp. v. Polaraid, Inc., 319 F.2d 830 (7th Cir.1963); see also Instrumentalist Co. v. Marine Corps League, 509 F.Supp. 323, 340 (N.D.Ill.1981) (citing Polaroid for proposition that district court may enjoin defendant's out-of-state infringement of plaintiff's rights acquired under Illinois anti-dilution statute). This is not to say, however, that a district court abuses its discretion to fashion appropriate relief when it does not accord out-of-state protection to an exclusive right. In fact, considerations of comity among the states favor limited out-of-state application of exclusive rights acquired under domestic law, and a district court does not err when it takes a restrained approach to the extraterritorial application of such rights.

■ With respect to the injunction, BRF contends that the district court should have recognized a "natural zone of expansion" for BRF when it fashioned relief. In our view, BRF's mere hope of expansion beyond its proven trade area is insufficient to support the protection sought. In the cases cited by BRF in which courts have extended protection into a natural zone of expansion, the plaintiff undertook affirmative steps to enlarge his trade area. Those steps included negotiations for the purchase of a chain of stores in the affected area, see Food Fair Stores Inc. v. Lakeland Grocery Corp., 301 F.2d 156, 162 (4th Cir.1962), authorization of marketing surveys for the area, see id., and preconditioning the area through extensive advance advertising, see Koffler Stores v. Shoppers Drug Mart, 434 F.Supp. 697, 704 (E.D. Mich.1976). In the instant case, BRF produced no credible evidence that it took similar affirmative steps or ever entertained realistic plans of expansion beyond its primary trade area. In fact, all the evidence points to the fact that the Sathers are, and for thirty-three years have been, content to own and manage a single store in New Richmond.

## C. Attorney's Fees

■ BRF contends that the district court erred when it failed to award to BRF the attorney's fees it incurred to vindicate its rights under state law. Since we do not find that BRF's request for attorney's fees implicates a federal statute or rule of court, we look to state law governing the award of such fees in this diversity case. See Alyeska Pipeline Service Co. v. Wilderness Society, 421 U.S. 240, 259 n. 31, 95 S.Ct. 1612, 1622 n. 31, 44 L.Ed.2d 141 (1975); Tryforos v. Icarian Development Co., 518 F.2d 1258, 1265 & n. 27 (7th Cir. 1975); C. Wright & A. Miller, Federal Practice and Procedure § 4513 (1982). Wisconsin follows the rule that in cases other than those involving third-party litigation, a plaintiff may not recover attorney's fees in the absence of a statute entitling him to such fees. See Murray v. Holiday Rambler, Inc., 83 Wis.2d 406, 435, 265 N.W.2d 513, 528 (1978); Cedarburg Light & Water Commission v. Glens Falls Insurance Co., 42 Wis.2d 120, 124–25, 166 N.W.2d 165, 168 (1969). BRF has not presented

this court with any Wisconsin statute on point, nor has our independent investigation uncovered one which would lead to recovery in this case. *See, e.g.,* Wis.Stat. § 132 (1983). Accordingly, the district court committed no error when it denied BRF the attorney's fees it incurred to vindicate its rights in its trade name.

## CONCLUSION

Because CENEX failed to show that trial was necessary to resolve genuinely disputed factual issues, the district court correctly rendered summary judgment on the issue of liability in favor of BRF. The district court also correctly ordered CENEX to pay BRF $114,999 with interest and correctly enjoined CENEX from selling, distributing, or advertising any of its animal feed products under the Blue Ribbon name in that part of Wisconsin within a twenty-mile radius of BRF's New Richmond store. The judgment of the district court, accordingly, is

AFFIRMED.