**ORECK CORPORATION, Plaintiff,**

v.

**THOMSON CONSUMER ELECTRONICS, INC.,**
Defendant.

**No. IP 89–612–C.**

United States District Court,
S.D. Indiana,
Indianapolis Division.

June 16, 1992.

Paul T. Meiklejohn, Seed & Berry, Seattle, Wash. and Richard L. Darst, Mantel, Cohen, Garelick, Reiswerg & Fishman, Indianapolis, Ind., for plaintiff.

James M. Durlacher, Woodard, Emhardt, Naughton, Moriarty & McNett, Indianapolis, Ind., for defendant.

## PARTIAL SUMMARY JUDGMENT

BARKER, District Judge.

### I. Background

In 1968, David Oreck, an authorized RCA dealer, had the idea to market RCA products using the words "XL" and "X-TENDED LIFE." However, concerned that the Federal Trade Commission might consider an "XL" mark misleading, RCA instructed Oreck not to use "XL" in connection with any RCA product.

Oreck complied with RCA's request, but was undaunted by RCA's rejection of his "XL" campaign, and, in 1969, started using "XL" and "X-TENDED LIFE" in association with other, non-RCA products that he sold from his dealership. In 1970, Oreck registered the "XL" trademark (for vacuum cleaners),[1] but it was only a matter of

---

1. Oreck also registered the "XL" trademark for washing machines, dryers, refrigerators, freezers, kitchen ranges, microwave ovens, phonographs, radio receiver, stereo amplifiers, magnetic tape players and recorders, and electric carpet shampooers in 1975. Oreck registered the "X-TENDED LIFE" mark for phonographs, radio receivers, stereo amplifiers, magnetic tape

time (one year) before RCA technology caught up with Oreck's advertising campaign.

In 1971, RCA began installing a 100% solid state chassis in its televisions, an improvement RCA believed "extended" the life of its televisions. No longer concerned with potential charges of deceptive advertising, RCA spoke to Oreck over the phone about using the "XL" designation; RCA knew Oreck had been using the "XL" mark on other, non-RCA products. After discussing the "XL" mark with Oreck, RCA sent Oreck the following letter:

28 April 1971

Dear Dave:

This will confirm our telephone discussion of today concerning RCA's proposed use of XL as part of a new advertising campaign.

You agreed that you and your affiliated companies have no objection to RCA's use of XL or a similar term in connection with the advertising and sale of television sets and you waive whatever right you may have to the term XL with respect to the use of that term in connection with RCA television products.

I would appreciate your returning the enclosed copy of this letter after you have signed it.

Very truly yours,

[signature of RCA official]

Oreck signed the tendered copy of the letter and returned it to RCA. RCA began using an "XL–100" mark on its televisions the following year, in 1972.

In 1975, RCA filed an Application for Trademark Registration of the "XL–100" mark with the Patent and Trademark Office. As part of that application, the Executive Vice President of RCA, Robert L. Werner, submitted an affidavit, which stated in part:

[Werner] believes said corporation to be the owner of the mark sought to be registered; to the best of his knowledge and belief no other person, firm, corporation, or association has the right to use said mark in commerce, either in the identical form or in such near or resemblance thereto as to be likely, when applied to the goods of such other person, *to cause confusion, or to cause mistake or to deceive;* ...

Thomson's Motion for Summary Judgment on the Grounds of Laches, Estoppel, Acquiescence and Statute of Limitations, Exhibit 5.

Unaware of, or perhaps unconcerned by Oreck's prior registration of "XL," the Patent and Trademark Office approved and published for opposition the "XL–100" trademark on December 9, 1975. Oreck's attorney, Nichol Sandoe, who Oreck "charged with the responsibility of protecting [Oreck Corporation's] trademarks," (*see* Oreck's Deposition of September 11, 1990, p. 156),[2] learned of the "XL–100" registration, and on January 7, 1976 filed a request for an extension of time to oppose registration of the "XL–100" trademark. However, Sandoe took no further action to oppose the "XL–100" registration nor did he tell Oreck that RCA had registered that trademark, and the "XL–100" trademark was registered without opposition on April 13, 1976. The "XL–100" registration remained uncontested for five years, and on April 13, 1981, the "XL–100" trademark became "incontestable." *See* 15 U.S.C. § 1056.

RCA enjoyed success with the "XL–100" campaign, and, in early 1977, RCA started using an "XtendedLife" mark on its televisions. Later that year, RCA filed an Application for the Registration of the "XtendedLife" mark with the Patent and Trademark Office.

players and recorders, domestic-use vacuum cleaners, electric carpet shampooers, and "machines for commercial-industrial use—namely, vacuum cleaners and electric carpet shampooers" in 1979.

**2.** Oreck stated in his deposition, "I charge them [Sandoe and his firm] with the responsibility of protecting our trademarks, and it's something

that I obviously know little about. They're supposed to keep track of it, and those things that expire they're supposed to refile and whatever else you're supposed to do. Quite frankly, I'm—it's just in their hands how to handle this." Oreck's Deposition of September 11, 1990, p. 156.

Oreck learned about RCA's attempt to register the "XtendedLife" mark in 1977, and in the process, also discovered (although the record does not reveal exactly how) that RCA had already registered the "XL–100" mark. Angered by what he had discovered, Oreck instructed his attorney to remind RCA of his position that he, not RCA, owned "XL" and "X–TENDED LIFE." RCA apparently did not agree with Oreck's position, and the two began negotiating/debating the ownership and use of the "X–TENDED LIFE" mark.[3] Eventually, Oreck offered to grant RCA a license to use the "X–TENDED LIFE" mark if RCA would withdraw its "Xtended-Life" registration application. Either RCA accepted that offer (according to Oreck's Deposition of April 18, 1989, *see infra* note 3, and Jack K. Sauter's Affidavit of March 9th, 1989, ¶ 4) or RCA refused Oreck's license offer, withdrew its trademark application for other reasons, and Oreck and RCA continued these negotiations/debates regarding the use and/or ownership of "XL–100" and/or "X–TENDED LIFE" until 1982[4] or 1987. (*See* Oreck's Declaration of April 2, 1991, ¶¶ 4–5; Plaintiff's Opposition to Defendant's Motion for Partial Summary Judgment, p. 12: "In this case, Oreck first complained about RCA's registration of the mark in 1977. Thereafter attempts to settle continued until about 1987."). In any event, on September 16, 1982, RCA sent Oreck's attorney a letter regarding its final position regarding the "XL Marks." That letter, in relevant part, stated:

*Re: XL Marks*

\* \* \* \* \* \*

As previously stated, RCA does not wish to adversely affect Mr. Oreck's trademark rights in his registered and common law trademarks.

RCA does, however, maintain its claims to its own rights to the "XL–100" mark for television sets based on its longstanding usage of the mark for such goods, Mr. Oreck's acknowledgement of RCA's letter to him, dated April 28, 1971, by which he waived whatever right he may have to the term "XL" with respect to the use of that term in connection with RCA television products, as well as USPTO Registration No. 1,037,820.

Hopgood's Deposition of April 24, 1991, Exhibit 18.

In 1988, Thomson Consumer Electronics, RCA's successor corporation,[5] terminated Oreck's authority to sell RCA products and

---

**3.** Although Oreck was displeased by what he described as RCA's "sneaking in, if you will, to register the XL–100," Oreck claims he took no steps to cancel the "XL–100" registration, revoke the "XL" license, or sue for trademark infringement of "XL" prior to filing this lawsuit:

> A. [A]nd everyone clearly understood that the sneaking in, if you will, to register the XL–100, was something that I did not accept, and it was wrong, and they didn't deny it either. The only thing is that I was—had no intention of creating waves at that time. I was the distributor. And substantively, it didn't make—it wasn't essential for me at that time or imperative that I wanted to take some action to reverse this, because I was the distributor. And within the spirit of that, I was not looking to create a hostile environment, when they are my biggest supplier and I am their customer. So I chose not to make an issue beyond the fact of clarifying just what belonged to who and so on, which I did, and they understood.
> Q. You say they understood. Did they agree?
> A. Sure they agreed. They had no alternative.

Oreck Deposition of April 18, 1989, p. 105–06. When asked whether he ever attempted to cancel the "XL–100" registration, Oreck stated:

> I believe I answered that before, which was when I finally did learn of this, it was long after the fact; and not being familiar with the legal ramifications and so on, but I felt from a practical business matter while this was dead wrong and certainly unethical, to say the very least, on RCA's part, I was loath to rock the boat and gain the animosity of the people who I had to deal with every day.... I wrestled with the problem. In retrospect, I don't think I would do it the same way if I had to do it all over again, but that's history.

*Id.* at pp. 180–81.

**4.** According to Oreck's second trademark attorney, Roy C. Hopgood, "there was an ongoing discussion with RCA [in 1977] regarding respective rights in "[X–TENDED LIFE]." Hopgood Deposition of April 24, 1991, p. 58–59. Hopgood testified that these negotiations continued through 1982. *Id.* at 78.

**5.** RCA was purchased by General Electric in 1986. General Electric's Consumer Electronics Division (the division that sells televisions) was purchased by Thomson in 1987.

filed an action (in another court) against Oreck for non-payment of a debt. In response, on March 15, 1989, the Oreck Corporation filed this action against Thomson for trademark infringement, claiming (1) false designation of origin (of "XL–100" and "X–TENDED LIFE") under § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a); (2) trademark infringement (of "XL–100" and "X–TENDED LIFE") under § 32 of the Lanham Act, 15 U.S.C. § 1114; (3) fraudulent obtainment of a trademark registration (of "XL–100") under § 37 of the Lanham Act, 15 U.S.C. § 1119; (4) and (5) two violations of the Connecticut Unfair Trade Practice Act (regarding "XL–100" and "X–TENDED LIFE"), and (6) unjust enrichment (regarding "XL–100" and "X–TENDED LIFE").[6]

Thomson filed its answer with counterclaims (alleging breach of contract and seeking cancellation of Oreck's "XL" trademark) and a motion to dismiss, claiming that Oreck's third claim, the claim upon which Thomson argues all infringement claims against the "XL–100" mark rest, is barred because it fails to state a claim of fraud. Thomson also filed a motion for summary judgement, claiming that even if Oreck has stated a claim of fraud, since Oreck could have filed suit as early as 1976 (when Sandoe requested an extension of time to contest the "XL–100" registration), Oreck's complaint is barred by a statute of limitations, laches, acquiescence, and estoppel. Thomson also filed a second motion for summary judgment based on the April 28, 1971 "waiver agreement." These motions for dismissal and summary judgment are the subject of this entry.

## II. Discussion

### A. The April 28, 1971 Letter: Is it the Entire, Integrated Contract?

Addressing first Thomson's second motion for summary judgment, the Court is asked by Thomson to find as a matter of law that Oreck waived his interest in the trademark(s) at issue. Oreck claims, in response, that the April 28, 1971 letter represents only a part of an oral/written license. Oreck claims that prior (and subsequent) to signing the April 28, 1971 letter, Oreck and RCA verbally agreed that RCA could use the "XL" mark only for as long as RCA authorized Oreck as a distributor of RCA products. Oreck asserts in his declaration:

> In 1971, when [an RCA official] asked me to sign the letter.... I was told, and understood at that time this letter merely reduced to writing the agreement which RCA and I had already orally consummated. That agreement, as I understood it then, and as I understand it now, was that RCA was an exclusive licensee under my mark "XL" and would continue as an exclusive licensee as long as McDonald Sales corporation continued as a distributor of "XL" television products.

Oreck's Declaration (not dated), ¶ 6.[7]

In support of his position, Oreck also filed with this Court a sworn declaration of

---

**6.** Under the Lanham Act, cancellation proceedings may be brought administratively before the Patent and Trademark Office under 15 U.S.C. § 1064 (§ 14) or judicially in a federal court under 15 U.S.C. § 1119 (§ 37). *See* J. Thomas McCarthy, Trademarks and Unfair Competition § 30:32, p. 524 (2nd ed. 1984) ("The net effect of § 37 is to give the courts concurrent power with the Patent and Trademark Office to conduct cancellation proceedings.").

**7.** Oreck also claims that under this license agreement, he had the right to control the quality of RCA televisions that bore the "XL–100" mark:

> And so I, being [RCA's] distributor and they being my supplier, said that I would agree to [let RCA use the "XL" mark]; and as long as I was the distributor[,] they had the license

> under the terms of this, which they acknowledged that would protect our mark, that we would have the right to inspect merchandise as to quality, so that we would protect out mark.

Oreck's Deposition of April 18, 1989, p. 91. Further, according to Oreck's response to Interrogatory No. 25:

> Oreck Corporation had control over the general quality standards for XL–100 television sets.... Oreck reviewed the product that passed through the McDonald distributorship and McDonald Sales during the time period of the license and had overall authority for coordinating the quality review.

*See Gorenstein Enterprises, Inc. v. Quality Care–USA, Inc.,* 874 F.2d 431 (7th Cir.1989) (a license requires quality control).

an RCA employee, Jack K. Sauter, in which Sauter affirms:

4. I personally negotiated the agreement between David Oreck and RCA for use of the "X–TENDED LIFE" mark and had discussions with RCA personnel and David Oreck concerning the "XL" mark.

\* \* \* \* \* \*

19. My understanding of the agreement between Oreck and RCA as to the "XL" mark is that Oreck would retain ownership of the trademark, but allow RCA to use it.

20. I knew that Oreck permitted RCA to use the "XL" mark without paying any money. It was assumed that if [Oreck] ceased to be an RCA distributor, whether voluntarily or involuntarily, RCA would have been placed in the position of having to renegotiate the rights to the mark "XL."

Jack K. Sauter Declaration of March 6, 1990; *see also* Sauter's Affidavit of March 9, 1989, ¶¶ 3–4.

Thomson, on the other hand, claims that the plain language of the April 28, 1971 letter indicates not a license, but a waiver, a "consent to use," [8] or an assignment.[9] Thomson further claims that Oreck's and Sauter's statements about the agreement are irrelevant because they would be inadmissible at trial under Indiana's parol evidence rule.

Generally, parol evidence is inadmissible to expand, vary, or explain a written instrument. *Kruse Classic Auction Co. v. Aetna Casualty & Surety Co.,* 511 N.E.2d 326, 329 (Ind.Ct.App.1987). However, evidence of a prior oral statement can add to a written agreement when the agreement is not "completely integrated." *Franklin v. White,* 493 N.E.2d 161, 166 (Ind.1986); *see Citizens Progress Co. v. James O. Held & Co.,* 438 N.E.2d 1016 (Ind.Ct.App.1982) ("Indiana recognizes the validity of a contract resting partly in writing and partly in parole...."). "A completely integrated contract is a final and complete expression of all of the parties' agreements." *Franklin v. White,* 493 N.E.2d at 166. The key question with regard to integration is whether the parties intended the writing to represent a complete integration, and a determination of intent and integration "requires the court to hear all relevant evidence, parol or written." *Franklin v. White,* 493 N.E.2d at 166–67 ("The written word is preferred as evidence because it is not subject to the vicissitudes of human memory. However, whether a particular writing constitutes such preferred evidence must depend on the intentions of the parties.").

Whether the April 28 letter is a fully integrated waiver, "consent to use," or assignment, or whether it is part of an oral and written license,[10] depends necessarily on the intent of the parties. *Id.* To

---

**8.** A consent agreement is neither an assignment nor a license. It is not an assignment because neither party is assigning any rights in their marks to the other. It is not a license because party A is not granting a right to use to Z in return for payment of royalties. In a license, the licensee is engaging in acts which would infringe the licensor's mark but for the permission granted in the license. In that event, quality control is essential. But in a consent, the consentee is permitted to engage in defined actions which do not infringe the consentor's mark, and the agreement implicitly or explicitly recognizes that. If, in fact, party A "consents" to Z's usage which is an infringement, then it would be a "license" which requires quality control to be valid and not to result in possible abandonment or loss of priority. A consent agreement does not require quality control because by the very essence of the agreement, the parties recog-

nize that concurrent usage does not lead customers to link the goods or services of the parties. Whereas a license brings the parties together into a common public image and a joint enterprise, a consent agreement keeps the parties apart at a defined distance. A license integrates, while a consent differentiates.

J. Thomas McCarthy, Trademarks and Unfair Competition § 18:25, p. 866 (2d ed. 1984).

**9.** There is no evidence that Oreck assigned these marks to RCA. This entry therefore focuses on the distinctions between a license, waiver, and "consent to use."

**10.** A trademark license may be oral as well as written. *Council of Better Business Bureaus, Inc. v. Better Business Bureau, Inc.,* 200 U.S.P.Q. (BNA) 282, 289 (S.D.Fla.1978); *see* Siegrun D. Kane, Trademark Law 339 (2d ed. 1991).

**1158**

determine that intent, this Court must consider all relevant written and parole evidence—including Oreck's and Sauter's statements regarding an oral license—and must assume, for purposes of making this ruling, that such a discussion did take place between Oreck and RCA prior to the signing of the April 28, 1971 letter. *Id.; see Williams v. Anderson,* 959 F.2d 1411, 1413–14 (7th Cir.1992) (to determine if there is a genuine issue of fact for trial on a motion for summary judgment, courts "must view the record and all inferences drawn from it in the light most favorable to the party opposing the motion"); *Lohorn v. Michal,* 913 F.2d 327, 331 (7th Cir.1990); *see also Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986).

▪ Whether RCA did indeed promise it would continue to authorize Oreck as a RCA dealer in exchange for its use of the "XL" mark creates a genuine issue material fact. Stated otherwise, there is a genuine issue of material fact over whether the April 28, 1971 letter was in fact a completely integrated document. Since there is evidence to support Oreck's contention that the April 28, 1971 letter is not a completely integrated contract, and, because that issue bears on the determination of whether Oreck licensed, waived, gave away, assigned, or consented to RCA's use of the "XL" mark, Thomson's motion to dismiss

and motion for summary judgment based on the April 28, 1971 letter are therefore denied.[11]

### B. Trademark Registration

The usual procedure for registration of a trademark begins with the filing of an application, and once a trademark registration application is filed, if it appears to the Patent and Trademark Office that a mark is entitled to registration, that mark is published in the Official Gazette of the Patent Office. 15 U.S.C. § 1062(a); *Park 'N Fly, Inc. v. Dollar Park and Fly, Inc.,* 469 U.S. 189, 202, 105 S.Ct. 658, 665, 83 L.Ed.2d 582 (1985); *Money Store v. Harriscorp Finance, Inc.,* 689 F.2d 666, 670–71 (7th Cir. 1982). Within thirty days of publication, any person who believes that she would be damaged by the registration of a mark may oppose that registration. 15 U.S.C. § 1063; *Money Store v. Harriscorp Finance, Inc.,* 689 F.2d at 671. Registration of a mark with the Patent and Trademark Office provides constructive notice of a registrant's claim to ownership. 15 U.S.C. § 1072; *Park 'N Fly, Inc. v. Dollar Park and Fly, Inc.,* 469 U.S. at 202, 105 S.Ct. at 665.

▪ If a registered mark is not contested for five years, the mark becomes "incontestable." 15 U.S.C. § 1065. But, even after a mark becomes "incontestable," other statutes[12] provide a procedure for as-

**11.** Clearly, the nature and effect of the April 28, 1971 is in dispute. However, for purposes of discussing the remaining issues presented in Thomson's motions, this Court resolves all factual disputes in favor of the non-moving party (Oreck) and assumes (again, for purposes of this Entry only) that the April 28, 1971 letter is only half of an oral/written license agreement; a license whereby RCA was permitted to use the "XL" mark only for as long as it authorized Oreck to sell its products.

**12.** Title 15, U.S.C. § 1115 prescribes the effects of registration and incontestability in an infringement action. It provides in relevant part:

**(a) Evidentiary value; defenses**

Any registration ... of a mark registered on the principal register provided by this chapter and owned by a party to an action shall be admissible in evidence and shall be prima facie evidence of the validity of the registered mark and of the registration of the mark, of the registrant's ownership of the mark, and of

the registrant's exclusive right to use the registered mark in commerce on or in connection with the goods or services specified in the registration subject to any conditions or limitations stated therein, but shall not preclude another person from proving any legal or equitable defense or defect, including those set forth in subsection (b) of this section, which might have been asserted if such mark had not been registered.

**(b) Incontestability; defenses**

To the extent that the right to use the registered mark has become incontestable under section 1065 of this title, the registration shall be conclusive evidence of the validity of the registered mark and of the registration of the mark, of the registrant's ownership of the mark, and of the registrant's exclusive right to use the registered mark in commerce. Such conclusive evidence shall relate to the exclusive right to use the mark on or in connection with the goods or services specified in the application filed under the provisions of the

serting specific challenges to that mark, including the claim that "the registration or the incontestable right to use the mark was obtained fraudulently." 15 U.S.C. § 1115(b); *Park 'n Fly, Inc. v. Dollar Park and Fly, Inc.*, 469 U.S. at 202, 105 S.Ct. at 666 ("A mark may be cancelled at any time for certain specified grounds, including that it was obtained fraudulently or has become generic."); *Robi v. Five Platters, Inc.*, 918 F.2d 1439 (9th Cir.1990) ("incontestable" trademark may be cancelled if a registrant made a fraudulent statement regarding ownership in the registration application).

1. Fraud in the Registration Application

Because Thomson's "XL–100" trademark has become "incontestable," in order for Oreck to prevail on any of his "XL–100" infringement claims, he must first seek cancellation of the "incontestable" trademark under one of the enumerated exceptions of § 1115(b). Oreck seeks to cancel the "incontestable" trademark on the basis of fraud under § 1115(b)(1), claiming, "At the time [RCA] applied for federal registration with the Patent and Trademark Office ... RCA knew it did not own the 'XL–100' mark." Oreck's Complaint, ¶ 29. Despite this strong language in his complaint, in subsequent filings Oreck makes clear that he does not allege that the "XL–100" RCA registrant (Robert Werner, personally) had actual knowledge of the RCA–Oreck license, but that fraud was committed because RCA, as a corporate registrant, had constructive knowledge of the Oreck/RCA license.[13]

Allegations of trademark fraud must be stated with particularity in accordance with Fed.R.Civ.P. 9(b); a general allegation of fraud without an accompanying recitation of details is insufficient. The pleadings must contain an explicit rather than implied expression of the circumstances constituting fraud. *King Automotive, Inc. v. Speedy Muffler King, Inc.*, 667 F.2d 1008, 1010 (C.C.P.A.1981); J. Thomas McCarthy, Trademarks and Unfair Competition § 31:21, p. 616. For an inaccurate statement in a registration application to constitute fraud, the plaintiff must show by clear and convincing evidence that the misstatements were "(1) made with *knowledge* of their falsity, and (2) ... *material* to the determination to grant the application." *Marshak v. Sheppard*, 666 F.Supp. 590, 598 (S.D.N.Y.1987) (emphasis in original); *accord Money Store v. Harriscorp Finance, Inc.*, 689 F.2d at 670; *Brittingham v. Jenkins*, 914 F.2d 447, 453 (4th Cir.1990) (plaintiff must show "deliberate intent" to deceive); *Five Platters v. Purdie*, 419 F.Supp. 372, 384 (D.Md.1976)). The Trademark Board has often observed:

> Intent to deceive must be "willful." If it can be shown that the statement was a "false representation" occasioned by an "honest" misunderstanding, inadvertence, negligent omission or the like rather than one made with a willful intent to deceive, fraud will not be found. [Citations] Fraud, moreover, will not lie if it can be proven that the statement, though false, was made with a reasonable and honest belief that it was true.... There

---

section 1065 of the title, or in the renewal application filed under the provisions of section 1059 of the title if the goods or services specified in the renewal are fewer in number, subject to any conditions or conclusive evidence of the right to use the registered mark shall be subject to proof of infringement as defined in section 1114 of the title, and shall be subject to the following defenses or defects:

(1) That the registration of the incontestable right to use the mark was obtained fraudulently; or

\* \* \* \* \* \*

(8) That equitable principles, including laches, estoppel, and acquiesce, are applicable.

**13.** In Oreck's Supplemental Memorandum in Opposition to Thomson's Motion to Dismiss, Oreck argues:

> RCA officers and agents with whom it contracted were aware that RCA did not own the contested mark and that RCA used it pursuant to a license agreement. Thus, RCA (through these individuals) knew that it did not own that mark yet represented to the PTO (through those or other individuals acting on behalf of RCA) that RCA owned the mark in order to fraudulently obtain the registration.

Oreck's Supplemental Memorandum in Opposition to Defendant's Motion to Dismiss, p. 6.

is no room for speculation, inference or surmise, and obviously, any doubt must be resolved against the charging party. *Citibank N.A. v. Citibanc Group, Inc.,* 215 U.S.P.Q. 884, 902 (N.D.Ala.1982) (citing *Smith International, Inc. v. Olin Corp.,* 209 U.S.P.Q. 1033, 1043–1044 (T.T.A.B. 1981)), *aff'd* 724 F.2d 1540, 222 U.S.P.Q. 292 (11th Cir.1984); *see* J. Thomas McCarthy, Trademarks and Unfair Competition, § 31:21, p. 605–06. It is not enough that a corporate officer's statements (in a trademark application) are only inaccurate or misleading. "Fraud will be deemed to exist only when there is a deliberate attempt to mislead the Patent Office into registering the mark." *Money Store v. Harriscorp. Finance, Inc.,* 689 F.2d 666 (7th Cir. 1982); *accord Schwinn Bicycle Co. v. Murray Ohio Manufacturing Co.,* 339 F.Supp. 973, 983 (M.D.Tenn.1971), *aff'd* 470 F.2d 975, 176 U.S.P.Q. 161 (6th Cir.1972).

 Query, then: can constructive knowledge by a corporation, where there is no actual knowledge by the individual registrant, of a license or a prior use/registration of a mark satisfy the first element of a fraudulent obtainment claim? [14] The short answer is no, it cannot. To constitute fraud, a registrant must have made a material misstatement with deliberate, wilful intent; "false" requires "knowing falsity," and a mere "mistake" in a representation to the Patent and Trademark Office is not sufficient. *Money Store v. Harriscorp Finance, Inc.,* 689 F.2d 666 (7th Cir.1982); J. Thomas McCarthy, Trademarks and Unfair

Competition § 31:22, p. 619–20. A material misstatement in a trademark registration regarding ownership of the mark, where the registrant did not know that he was using the mark pursuant to a license, falls in the category of inadvertent mistake, not fraud.[15]

Oreck argues that this conclusion leads to the unacceptable result where "a multinational corporation with world-wide sales[] can obtain an incontestible trademark registration through submission of a false application claiming ownership of trademark owned by another, so long as the human being who signs the application isn't aware of the falsehood!" Oreck's Supplemental Memorandum in Opposition to Defendant's Motion to Dismiss, p. 3. This concern, however, is misplaced. If an official of a corporation knows that someone is using a particular mark, and in an effort to steal that mark, instructs another unknowing official of the same corporation to file a trademark registration application, that trademark registration could be opposed upon publication under 15 U.S.C. § 1063 or subsequently cancelled as being "procured ... by any false means" and would state a claim for damages under 15 U.S.C. § 1120.[16] *See Seidelmann Yachts, Inc. v. Pace Yacht Corp.,* No. JH–97–3490, 1989 WL 214497, 1989 U.S. Dist. LEXIS 17486 (D.C.Md. April 27, 1989). Oreck does not allege that RCA conspired or otherwise fraudulently obtained the trademark, but only that by virtue of "corporate knowledge" did the RCA registrant commit a

---

**14.** Whether the RCA registrant had corporate or constructive knowledge of a license or Oreck's use and registration is a question of a fact which this Court, for purposes of this Entry only, resolves in favor of Oreck, the non-movant. *See Williams v. Anderson,* 959 F.2d 1411, 1413–14 (7th Cir.1992); *see supra* note 10.

**15.** The corporate knowledge cases Oreck cites address only whether constructive or corporate knowledge is sufficient to put a potential litigant on notice of ongoing trademark infringement. *See Georgia–Pacific Corp. v. Great Plains Bag Co.,* 614 F.2d 757 (C.C.P.A.1980). Oreck fails to cite, nor can this Court locate, any case where a corporate mistake constitutes fraud—the *Georgia–Pacific* type cases, including *Hard Rock Cafe Licensing v. Concession Services,* 955 F.2d 1143 (7th Cir.1992), simply fall short of addressing

the special intent concerns unique to a charge of fraud. *See* J. Thomas McCarthy, Trademarks and Unfair Competition § 31:21.

**16.** [Section] 38 should be read in pari materia with sections 14(c) and 33(b)(1), which require that the registration was obtained "fraudulently." To read § 38 as imposing damage liability for an honest but "false" misstatement would create a bizarre paradox in which cancellation or a defect in incontestability is refused because the misstatement was not "fraudulent," but the registrant is liable for damages because it made a "false" misstatement. Such a result in not a common sense reading of the Lanham Act as a whole. J. Thomas McCarthy, Trademarks and Unfair Competition § 31:22, p. 620.

constructive fraud. It is draconian, and clearly at odds with the statutory scheme of the Lanham Act, to impose damages for an honest mistake, *see* J. Thomas McCarthy, Trademarks and Unfair Competition § 31:22, p. 620, and because Oreck has failed to allege that the RCA registrant acted with "knowing falsity," Oreck has failed to plead sufficiently a claim of fraud in Count Three. *See Money Store v. Harriscorp Finance, Inc.,* 689 F.2d 666 (7th Cir.1982); *see also King Automotive, Inc. v. Speedy Muffler King, Inc.,* 667 F.2d at 1011 (petition lacked the prerequisite averments of fact supportive of registrant's belief the registration statement was false).

### 2. Effect of Dismissing Claim Three

Oreck alleges trademark infringement and unfair use of the "XL–100" mark in claims one, two, four, five, and six. However, because claim three, which seeks cancellation of the "XL–100" registration, fails, the remaining "XL–100" claims are without merit by nature of the "incontestible" status of the "XL–100" mark. 15 U.S.C. § 1115(b). Therefore, to the extent claims one, two, four, five, and six allege trademark infringement and unlawful use of the "XL–100" mark, those claims are also subject to dismissal as each fails to state a claim upon which relief can be granted. .

### C. Laches

In addition to dismissing the "XL–100" claims on the basis that they fail to state a claim, this Court dismisses those claims on the alternative basis of laches.[17]

 A defense of laches is available where there has been a lack of diligence by the party against whom the defense is asserted and prejudice to the defending party. *Lingenfelter v. Keystone Consolidated Industries, Inc.,* 691 F.2d 339, 340 (7th Cir.1982). A request for relief in an trademark infringement action is barred by lach-

es when a plaintiff's delay is "unreasonable, inexcusable, and prejudicial to the defendant." *Blue Ribbon Feed Co. v. Farmers Union Cent. Exchange, Inc.,* 731 F.2d 415 (7th Cir.1984). Prejudice may be presumed when the delay is unreasonable and inexcusable. *Baker Manufacturing Co. v. Whitewater Manufacturing Co.,* 430 F.2d 1008, 1009 (7th Cir.1970); *cert. denied,* 401 U.S. 956, 91 S.Ct. 978, 28 L.Ed.2d 240 (1971). Before delay can constitute laches, a plaintiff must have been actually or constructively on notice of defendant's activities, and a "'reasonably prudent person' standard may be used to impute notice to a plaintiff who claims ignorance of defendant's past conduct." J. Thomas McCarthy, Trademarks and Unfair Competition, § 31:12 p. 582. Nevertheless, "laches is an equitable doctrine not fixed by any unyielding measure, but to be determined in each case under its factual situation, and allowable 'where the enforcement of the assured right would work injustice.'" *Baker Manufacturing Co. v. Whitewater Manufacturing Co.,* 430 F.2d at 1012 (citing *Boris v. Hamilton Manufacturing Co.,* 253 F.2d 526, 529 (7th Cir.1958); *see Piper Aircraft Corp. v. Wag–Aero, Inc.,* 741 F.2d 925 (7th Cir.1984).

 Federal registration of a trademark confers a number of benefits:

(1) constructive notice of the registrant's claim of ownership of their trademark; (2) *prima facie evidence* of the validity of the registration, *of the registrant's ownership of the mark, and of his exclusive right to use the mark in commerce* as specified in the certificate; (3) the possibility that, after five years, registration will become incontestable and constitute conclusive evidence of the registrant's right to use the mark; ... The most significant of these advantages are proof of ownership and incontestability.

---

**17.** The Lanham Act provides that the statutory presumption of a registered trademark "shall not preclude an opposing party from proving any legal or equitable defense or defense which might have been asserted if such mark had not been registered." 15 U.S.C. § 1115(a). Those equitable defenses include laches, estoppel, and acquiescence. 15 U.S.C. § 1115(b)(8); *see United States Jaycees v. Cedar Rapids Jaycees,* 794 F.2d 379, 382 (8th Cir.1986); *Land O'Lakes, Inc. v. Land O'Frost, Inc.,* 224 U.S.P.Q. (T.M.T.A.B. 1984) (16 year delay coupled with acquiescence constituted an affirmative defense to opposition and cancellation).

**1162**

*Brittingham v. Jenkins,* 914 F.2d 447, 452 (4th Cir.1990) (citations omitted) (emphasis added). Thus, RCA's registration of "XL–100," effective December 9, 1975, placed Oreck on constructive notice that RCA was taking a position contrary to a claimed license agreement and that it owned and had an exclusive right to use "XL–100." *Id.; see* 15 U.S.C. § 1072 (Lanham Act provides that registration on the Principle Register "shall be constructive notice of the registrant's claim of ownership"); *Coach House Restaurant, Inc. v. Coach & Six Restaurants, Inc.,* 934 F.2d at 1558; *see also Snelling and Snelling, Inc. v. Dupay Enterprises, Inc.,* 125 Ariz. 362, 609 P.2d 1062, 1065 (Ct.App.1980) (registration by licensee of licensed mark constitutes trademark infringement because it misleads the public into thinking that the registrant owns the mark). Oreck's contention that the license agreement was first breached when his dealership authorization was cancelled in 1988 is simply inconsistent with the nature and effect of a federal trademark registration, where the registrant claims that it has an exclusive right to the registered trademark. *See Coach House Restaurant v. Coach and Six Restaurants,* 934 F.2d 1551, 1558 (11th Cir.1991). Indeed, Oreck's testimony that he was "outraged" when he actually learned (in 1977 or 1978) that RCA had licensed the "XL–100" mark casts doubt on his claim that he was not harmed until Thomson terminated his dealer authorization in 1988.[18]

▮▮▮ Thus, Oreck is charged with having constructive knowledge of the license breach at least by 1975, based on the "XL–100" trademark registration and publication. In addition, Oreck had constructive knowledge of the license breach in 1976 based on Sandoe's (allegedly uncommunicated) knowledge of this registration, and Oreck admitted to having actual knowledge of the "XL–100" registration in 1977.[19] Oreck knew he had been wronged in 1975, 1976, and 1977, but nonetheless waited ten to thirteen years to file suit; such delay is unexcusable, as a matter of law.[20]

Despite this admission, Oreck's argues that laches does not apply since Oreck was engaged in continuous negotiations (until 1987) over the use and ownership of the "XL–100" mark. *See* Oreck's Declaration of April 2, 1991, ¶¶ 4–5; Plaintiff's Opposition to Defendant's Motion for Partial Summary Judgment, p. 12. Delay in filing suit for trademark infringement will not count towards laches if during that time the parties were engaged in good faith settlement negotiations, *Id.* at § 31:6, p. 569, but negotiations do not toll laches unless they are "continuously and bilaterally progressing with a fair chance of success." *A.C. Aukerman co. v. Miller Formless Co.,* 693 F.2d 697 (7th Cir.1982); *see Piper Aircraft Corp. v. Wag–Aero, Inc.,* 741 F.2d 925 (7th Cir.1984) (periods of negotiations were not counted towards laches, although 13 year hiatus in negotiations did constitute a bar).

Although there is one letter evincing that once in 1979, Oreck's attorney asked RCA if it would "consider" withdrawing the "XL–100" registration, *see* Roy C. Hopgood's Deposition of April 24, 1991, Deposition Exhibit B, Oreck's general and otherwise unsupported contention of continuous negotiations fails to present a genuine issue of material fact regarding whether the negotiations of the "XL–100" mark were anything but sporadic or unilateral. Rather, the Oreck and Hopgood depositions and the exhibits attached to Hopgood's deposition indicate that any post–1977 negotiations were focused on RCA's use of "X–TENDED LIFE," not "XL." *See*

18. When Oreck was deposed about when he discovered that RCA had registered "XL–100," he responded, "I really don't recall it. I would—I just don't remember the circumstances. But I do know that I learned about it well after the fact, and I also, quite frankly, was outraged at that." Oreck deposition of September 11, 1990, p. 58. During his second deposition, Oreck testified that upon learning about the "XL–100" registration, "I was infuriated by the fact that unbeknownst to me RCA had absconded with my XL mark and I—at that point in time I thought that was unbelievable for RCA." Oreck Deposition of September 11, 1990, p. 61.

19. Oreck testified that in " '76 or '77, somewhere in there ... it had come to my attention that they [RCA] had registered the XL–100 mark with full knowledge that it belonged to me, and that I considered that very bad behavior on their part." Oreck' Deposition of April 18, 1989, pp. 104–105; *see also* footnote 14.

20. Oreck claims he did not seek cancellation of the "XL–100" mark because he did not want to anger his biggest customer, RCA. Oreck's Deposition of April 18, 1989, p. 106; *see infra* note 6. The preservation of good business relations, however, is not a valid reason to excuse delay. *Technitrol, Inc. v. Memorex Corp.,* 376 F.Supp. 828, 833 (N.D.Ill.1974), *aff'd* 513 F.2d 1130 (7th Cir.1975).

Thomson claims that beyond generalized, inferential prejudice, it has suffered specific prejudicial effects from this unexcusable delay. Thomson claims that the records regarding RCA's adoption and early use of the "XL–100" mark can no longer be located and/or no longer exist, that past RCA employees (potential witnesses) now live outside this Court's subpoena power, that Thomson would have acquired the "XL–100" mark at a lower price had it (or RCA) known about Oreck's claim against the mark, and that memories of key witnesses have lapsed. In response, Oreck claims that any prejudice flowing from RCA's or Thomson's promotional expenditures in this case was "self-inflicted." Oreck also claims that the memory lapses of the deposed witnesses are no more extensive than would be normally assumed, and that in many cases, the deponents' memories could be refreshed with appropriate prompting. Oreck further claims that Thomson has suffered no prejudice because there are no missing documents, and, in fact, Thomson has received a "windfall" from Oreck's advertising campaign.

Oreck's contention that RCA's and Thomson's injuries are "self-inflicted" is unpersuasive. RCA and its successors invested substantially to develop the "XL–100" mark, resources that RCA and it's successors would not have expended had Oreck timely pursued his claim against this mark. Whether or not certain documentation describing an oral license is now missing, the fact is that this case involves oral agreements made more than twenty years ago, and an examination of the filed depositions demonstrates that key witnesses cannot now remember many of the material facts regarding those agreements. Oreck's claim that there is no "unusual amount" of memory loss or that the deponents' memo-

ries could have been revived with gentle prodding is also without merit; the depositions are replete with indications of memories lapses and unsuccessful. efforts to refresh recollections. *See*, for example, Hopgood Deposition of April 24, 1991, pp. 40–80; Nichol Sandoe's Deposition of April 23, 1991, p. 39 ("[Question]: Since that accident [in 1979] is it fair to say you have memory problems? [Sandoe's Answer]: It sure is."). In the Court's view, those memory lapses alone are sufficient to constitute prejudice warranting relief. *Lingenfelter v. Keystone Consol. Industries, Inc.,* 691 F.2d at 342; *see Blue Ribbon Feed v. Farmers Union Cent. Exchange,* 731 F.2d at 420.

Finding both an unexcused delay and a resulting prejudice, this Court dismisses claims one through six, to the extent they allege trademark infringement or unfair use of the "XL–100" mark, on the alternative basis of laches.

### D. X–TENDED LIFE

Oreck asserts and/or presents evidence of three, somewhat inconsistent positions regarding "X–TENDED LIFE." According to Oreck's deposition testimony, Oreck claims that he granted RCA a license of the "X–TENDED LIFE" mark as part of the "XL" agreement in 1971, *see* Oreck Deposition of April 18, 1989, p. 96, but according to the same deposition, Oreck also claims that he granted RCA an oral license in 1978 (after RCA withdrew its registration of "XtendedLife"). *See* Oreck Deposition of September 11, 1990, pp. 50, 278. Oreck's third contention, based on his Declaration of April 2, 1991 and his Supplement to its Opposition to Defendant's Motion for Summary Judgment, is that he (unsuccessfully)

Hopgood's Deposition of April 24, 1991, Deposition Exhibit 2. Even the 1979 letter (which asks RCA to consider withdrawing the "XL–100" registration) and Oreck's general assertion that he continuously negotiated this mark until 1987 could somehow be construed as evidence of bilateral and fruitful negotiations, there is no evidence that negotiations continued after RCA tendered the September 16, 1982 letter. *See* Paul T. Meiklejohn Declaration of March 29, 1991, ¶ 2 (negotiations only documented until

1982). Therefore, even if this Court assumed that negotiations regarding "XL–100" bilaterally and fruitfully continued until 1982, this Court would still dismiss these claims as being barred by laches in light of Oreck's unexplained and unexcusable six and one-half year delay—from September 16, 1982 to March 15, 1989. *Lingenfelter v. Keystone Consol. Industries, Inc.,* 691 .F.2d at 342; *see Blue Ribbon Feed v. Farmers Union Cent. Exchange,* 731 F.2d at 420.

negotiated a license of the "X–TENDED LIFE" mark from 1977 to 1982 or 1987.

Despite these inconsistencies, there is sufficient evidence in the record to support the survival of Oreck's claim that he granted RCA an oral license of "X–TENDED LIFE" (in 1971 and/or 1978). Oral licenses are enforceable, *Council of Better Business Bureaus, Inc. v. Better Business Bureau, Inc.*, 200 U.S.P.Q. (BNA) 282, 289 (S.D.Fla.1978); *see* Siegrun D. Kane, Trademark Law 339 (2d ed. 1991), and Oreck's claim creates a genuine issue of material fact regarding whether in 1971 and/or in 1978 he granted RCA a license of "X–TENDED LIFE."

Assuming that Oreck did grant RCA a license in 1971 or 1978 (and perhaps the post–1978 "negotiations" were merely attempts to convince RCA that such a license was in effect), unless RCA earlier repudiated that license, an "X–TENDED LIFE" license was first breached in 1987 when Oreck's authorization to sell RCA televisions was terminated. The September 16, 1982 letter may evidence such a repudiation, despite the absence of an explicit reference to "X–TENDED LIFE" or "XtendedLife," referring instead only to "XL–100," under the vague caption *"Re: XL Marks."* Because that letter does not clearly repudiate an "X–TENDED LIFE" license, this Court assumes for purposes of this Entry that the license was not breached until 1987, and because Oreck filed this action within two years of that date, his claims of trademark infringement of the "X–TENDED LIFE" mark are not barred by any statute of limitations or delay-based equitable bar.

### III. Conclusion

Oreck's third claim (fraudulent obtainment of trademark registration) is dismissed because it fails to state a claim of fraud. To the extent they allege trademark infringement and unfair use of the "XL–100" mark, claims one, two, four, five, and six also fail because they do not state claims upon which relief can be granted. Alternatively, claims one through six, to the extent they allege trademark infringement, fraudulent obtainment of trademark registration, and unfair use of the "XL–100" mark, are dismissed in that they are barred by application of latches. Claims one, two, four, five, and six, to the extent they allege claims of trademark infringement and unfair use of the "X–TENDED LIFE" mark, survive Thomson's motions and are not dismissed. Thomson's second motion for summary judgment on the grounds of waiver is also denied.

It is so ORDERED.