Lottfie "Lou" ADRAY; Adray's CBS Premiums, Inc., Plaintiffs–Appellants,

v.

ADRY–MART, INC.; Parvis Navi; E. Matinkhoo; Einola Mateen; Musad Hakim, Defendants–Appellees.

No. 93–55930.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Feb. 6, 1995.

Decided Oct. 19, 1995.

Anton Arbisser, Kaye, Scholer, Fierman, Hays & Handler, Los Angeles, California, for defendants-appellees.

Before: BROWNING, D.W. NELSON and HAWKINS, Circuit Judges.

## OPINION *

JAMES R. BROWNING, Circuit Judge:

Both Lottfie "Lou" Adray and Adry–Mart, Inc. operate consumer electronics stores under the name "Adray's" in Southern California. Lou Adray sued for trademark infringement and unfair competition under state and federal law and filed this appeal from the final judgment. We reverse in part and remand.

### I. Facts

Lou Adray has operated an "Adray's" discount electronics store in Orange County since 1968. Except for a two to three year period in the mid–1970's, other members of the family operated other "Adray's" stores in Southern California until 1979, when they sold their businesses, including the right to use the "Adray's" name, to Adry–Mart, which has since operated several "Adray's" stores in Los Angeles County. In 1989 Adry–Mart opened a new "Adray's" store in Torrance, prompting Lou Adray to file this suit. Adry–Mart then opened another "Adray's" store in Lakewood, about five miles from Orange County, and Lou Adray moved for a preliminary injunction. The district court prohibited Adry–Mart from advertising its Lakewood store in Orange County or from opening any "Adray's" store in that county. Adry–Mart violated the advertising injunction, and the district court prohibited any media advertising by Adry–Mart of its Lakewood "Adray's" store.

The district court bifurcated Lou Adray's equitable and damage claims. A jury trial on the damage claim resulted in a verdict for Adry–Mart. After a bench trial on the equitable claims, the district court determined that Lou Adray and Adry–Mart had estab-

Franklin D. Ubell, Price, Gess & Ubell, Irvine, California, for plaintiffs-appellants.

---

* Adray's remaining challenges to the jury instructions are addressed in a separate memorandum disposition.

lished secondary meaning for the "Adray's" mark in Orange County and Los Angeles County respectively and that Adry–Mart's operation of its Lakewood and Torrance stores in Los Angeles County had not created a likelihood of confusion with Lou Adray's store in Orange County. The court entered an injunction limiting each party's advertising.

On appeal, Lou Adray challenges several jury instructions relating to his damage claim and the court's findings and remedy relating to his equitable claim.

## II. Damage Claim

### A. *Actual Confusion as Proof of Secondary Meaning*

■ The pertinent instruction did not list actual confusion among the factors the jury should consider in determining whether Lou Adray had established secondary meaning in the "Adray's" mark. The failure to include actual confusion was error: the law clearly establishes that "actual confusion is an indicium of secondary meaning," *American Scientific Chem. v. American Hosp. Supply*, 690 F.2d 791, 793 (9th Cir.1982); the record contained substantial evidence of actual confusion; and Lou Adray specifically requested the inclusion of this factor.

■ Adry–Mart contends the error was harmless because some customers came to Lou Adray's store under the mistaken belief that it was affiliated with Adry–Mart—suggesting that Adry–Mart and not Lou Adray's store had established secondary meaning. *See Bank of Texas v. Commerce Southwest, Inc.*, 741 F.2d 785, 789 (5th Cir.1989) (holding that evidence of actual confusion in which customers came to plaintiff's bank believing it to be associated with defendant did not support finding of secondary meaning **for plaintiff**). However, the record reflects incidents in which customers thought that Adry–Mart advertisements were placed by Lou Adray's store, and others in which customers tried to return items purchased at Adry–Mart stores to Lou Adray, thinking the other

stores were affiliated with his store. Moreover, in the trial of the equitable issues, the district court relied in part on evidence of actual confusion to find Lou Adray had established secondary meaning, suggesting the jury might have done the same if the secondary meaning instruction had included the factor of actual confusion.[1] We cannot say the error was harmless.

### B. *Geographic Scope of Secondary Meaning*

■ Because Lou Adray was entitled to protection for the "Adray's" mark only in the area within which he had established secondary meaning, the district court correctly instructed the jury to award damages only if Lou Adray established secondary meaning in the "market area[s]" in which Adry–Mart operated its Torrance and Lakewood "Adray's" stores. *See Bank of Texas*, 741 F.2d at 789 (plaintiff is entitled to protection in all of Dallas County only if he can establish secondary meaning in the entire area); *see generally* 3 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 26.10 (3d ed. 1994) [hereinafter *McCarthy* ] (rationale for requiring secondary meaning in a particular area before a descriptive mark user can preclude another from using the mark in that area).

*Fuddrucker's, Inc. v. Doc's B.R. Others, Inc.*, 826 F.2d 837 (9th Cir.1987), is not to the contrary. We held that Fuddrucker's, a national chain, was not required to establish secondary meaning in a particular disputed area if it could "show that its trade dress had acquired secondary meaning among some substantial portion of consumers nationally," *id.* at 844; Lou Adray does not claim he could demonstrate secondary meaning in the "Adray's" mark nationally. Moreover, in *Fuddrucker's* the alleged infringer had adopted its mark in bad faith with the intention of capitalizing on Fuddrucker's goodwill, *id.,* and bad faith adoption of a mark is a generally recognized exception to the requirement that secondary meaning be shown in a disputed area. *See* 3 *McCarthy* § 26.03.

---

1. Adry–Mart argues it was insufficient that Lou Adray could argue evidence of actual confusion to the jury. However, it is reasonable to assume that the jury simply considered the factors specifically listed in the instruction.

Lou Adray does not assert that Adry–Mart adopted the "Adray's" mark in bad faith. *See id.* § 26.10 (distinguishing *Fuddrucker's* on similar grounds from cases requiring a showing of secondary meaning in a certain area).

Adray argues the instructions erroneously barred any recovery unless Adray established secondary meaning throughout the geographic or economic boundaries of Lakewood and Torrance and were "fatally" ambiguous as to whether political or economic boundaries were to be considered. We agree with Adry–Mart that the instructions simply required that Adray establish secondary meaning in some part of the market areas of the Adry–Mart stores. Any confusion arising from the use of the word "geographic" rather than "market" can be addressed at retrial.

## C. *Willful Infringement as a Prerequisite for Damages*

■ The court also erred in instructing the jury that it had to find willful infringement before awarding damages.[2] Where two parties are in direct competition, the defendant's profits attributable to the infringement—the amount the jury was instructed to determine in this case—are a measure of the plaintiff's damages under the theory of unjust enrichment. *See Lindy Pen Co. v. Bic Pen Corp.,* 982 F.2d 1400, 1407 (9th Cir. 1993). Because a plaintiff can recover such damages even if the infringement was not willful, it was error to instruct the jury not to consider damages absent willful infringement. *See id.* at 1406–09 (analyzing defendant's profits as a measure of damages even after determining the infringement was not willful).

## D. *Corrective Advertising*

An award of the cost of corrective advertising, like compensatory damage awards in general, is intended to make the plaintiff whole. It does so by allowing the plaintiff to recover the cost of advertising undertaken to restore the value plaintiff's trademark has lost due to defendant's infringement. *Zazu Designs v. L'Oreal, S.A.,* 979 F.2d 499, 506 (7th Cir.1992). We have approved recovery of corrective advertising expenditures incurred before trial. *See, e.g., U–Haul Int'l, Inc. v. Jartran, Inc.,* 793 F.2d 1034, 1041 (9th Cir.1986).

■ Relying on *Big O Tire Dealers, Inc. v. Goodyear Tire & Rubber Co.,* 561 F.2d 1365, 1374–76 (10th Cir.1977), Lou Adray seeks to recover the cost of *prospective* corrective advertising—the amount he would be required to spend in the future to dispel the confusion caused by defendant's infringement. We have affirmed an award of prospective advertising costs in *Cher v. Forum Int'l., Ltd.,* 213 U.S.P.Q. 96, 103 (C.D.Cal.), *aff'd. in pertinent part,* 692 F.2d 634, 640 (9th Cir.1982). The district court declined to award such costs on the ground that prospective costs should be allowed only where the plaintiff demonstrates he was financially unable to conduct a corrective advertising campaign before trial. We see no reason to so limit the availability of essentially compensatory damages. Prospective costs may be difficult to determine precisely and present a danger of overcompensation if they exceed the value of the mark; *see Zazu,* 979 F.2d at 506; however, the burden of any uncertainty in the amount of damages should be borne by the wrongdoer, *Bigelow v. RKO Radio Pictures, Inc.,* 327 U.S. 251, 265, 66 S.Ct. 574, 580, 90 L.Ed. 652 (1945); *Story Parchment Co. v. Paterson Co.,* 282 U.S. 555, 563–64, 51 S.Ct. 248, 250–51, 75 L.Ed. 544 (1931), and overcompensation can be avoided by appropriate limitation in the instructions. Accordingly, Lou Adray is entitled to a jury instruction permitting a prospective corrective advertising award. The instruction should direct the jury to award such damages only to the extent that the amount of money needed for corrective advertising does not exceed the damage to the value of Lou Adray's mark.[3]

---

**2.** Lou Adray did not object to the instruction at trial and therefore may have waived appellate review. Nonetheless, in view of the remand for further proceedings, we consider the validity of the instruction in the interest of judicial economy.

**3.** We need not determine how the costs are to be calculated because the court below did not reach

## III. Equitable Claims

### A. *Geographic Scope of Each Party's Market Area*

■ The court did not clearly err when it found that Lou Adray had not established secondary meaning outside Orange County. The extent of market penetration depends upon the volume of sales, the positive and negative growth trends, the number of people who purchased the party's goods in relation to the number of potential customers, and the amount of advertising.[4] *Natural Footwear Ltd. v. Hart, Schaffner & Marx*, 760 F.2d 1383, 1398–99 (3rd Cir.1985); *accord Spartan Food Systems, Inc. v. HFS Corp.*, 813 F.2d 1279, 1283 (4th Cir.1987). The record includes evidence of some sales by Lou Adray in areas adjacent to Orange County. However, his sales had declined by more than 40%, he had no more than one and a half percent of the market in any community outside Orange County, and his advertising was largely restricted to the *Orange County Register*, which has almost no circulation outside Orange County.

■ The district court did clearly err, however, in finding that Adry–Mart's market area included the whole of Los Angeles County. This finding was supported by two factors—Adry–Mart's extensive advertising throughout Los Angeles County, especially in the *Los Angeles Times*, and its relatively strong growth. Nevertheless, Lou Adray made more sales, and hence had a greater market share, than Adry–Mart in at least some cities within Los Angeles County. Without more specific findings regarding market penetration in these communities, we cannot sustain the finding that Adry–Mart

had established secondary meaning in all of Los Angeles County.[5]

### B. *Likelihood of Confusion Due to Lakewood and Torrance Stores*

■ Lou Adray contends Adry–Mart's operation of its Lakewood and Torrance "Adray's" stores created a likelihood of confusion in Orange County—the area in which the district court found Adray had established secondary meaning in the "Adray's" mark. We conclude that the district court clearly erred when it concluded that Adry–Mart's operation of its Lakewood "Adray's" store—as opposed to its advertising of the store—did not create a likelihood of confusion within Orange County.

■ We apply a multi-factor test to analyze the likelihood of confusion: 1) the strength of the plaintiff's mark; 2) the similarity of the marks; 3) marketing channels and proximity of the services; 4) good faith and intent; and 5) evidence of actual confusion. *Nutri/System, Inc. v. Con–Stan Indus.*, 809 F.2d 601, 604 (9th Cir.1987); *AMF, Inc. v. Sleekcraft Boats*, 599 F.2d 341, 348–49 (9th Cir.1979).

■ Consideration of these factors strongly suggests that Adry–Mart's use of the "Adray's" mark at the Lakewood store created a likelihood of confusion within the area in which Lou Adray established secondary meaning: (1) personal names are treated as strong marks upon a showing of secondary meaning, *see E. & J. Gallo Winery v. Gallo Cattle Co.*, 967 F.2d 1280, 1291 (9th Cir.1992); (2) the marks in this case are identical; (3) the parties offer essentially the same goods and services and occupy the same marketing channels; and (4) the record contains signifi-

---

the issue. We note that courts have awarded a percentage of the advertising amount spent infringing on the plaintiff's mark, *Big O Tires*, 561 F.2d at 1375–76, and have acknowledged the Federal Trade Commission's rule requiring businesses who engage in misleading advertising to spend 25% of their advertising budget on corrective advertising. *Id.*

**4.** Moreover, if a mark requires secondary meaning for protection, "a much greater quantum of use in the disputed territory" is necessary to entitle a party to protection in that territory than would be needed for an inherently distinctive

mark. 3 *McCarthy* §§ 26.10–11; *see Charles Jacquin Et Cie v. Destileria Serralles*, 921 F.2d 467, 472–74 & n. 5 (3rd Cir.1990).

**5.** This is not to suggest that Lou Adray would be entitled to claim those communities as part of his market area. The more likely conclusion is that neither party established secondary meaning. Indeed, given the overlap of advertising and sales activities, it would be surprising if there were not some communities, especially along the border between the two counties, in which both parties had sufficient presence to prevent either from establishing secondary meaning.

cant evidence of actual confusion due to the Lakewood store. This confusion was independent of any confusion caused by the advertising of the store—the district court found "[c]onsumers continue to confuse the Lakewood store with Plaintiffs' store *even though Adry–Mart has been enjoined ... from media advertising of that store* other than by direct mail." (Findings ¶ 72) (emphasis added).

Thus, all but one of the relevant factors[6] strongly indicate that Adry–Mart's use of the mark in the operation of the Lakewood store, as distinct from its advertising, creates a likelihood of confusion. The district court's finding to the contrary is clearly erroneous, and the court should formulate an appropriate remedy to stem the potential confusion due to Adry–Mart's operation of the Lakewood store.

The district court's conclusion that use of the mark at the *Torrance* store did not create a likelihood of confusion was not clearly erroneous. Adray concedes there is less convergence of marketing channels, and the record contains much less evidence of actual confusion with respect to this store and little evidence of bad faith in Adry–Mart's decision to open an "Adray's" store in Torrance.

## C.  *Disclaimer Remedy*

■  The district court enjoined both parties from advertising in any medium with more than five percent of its circulation in the other party's market unless a substantial majority of the medium's circulation was within the advertising party's market[7] and the advertising party used a disclaimer. Lou Adray argues that the district court should have issued an absolute injunction against Adry–Mart's advertising in Lou Adray's mar-

ket area and that the particular percentage at which the district court forbade advertising was arbitrary.

A district court has a wide range of discretion in formulating an injunction. "[T]o succeed in [his] attack on the injunction, [Adray] must show that there was no reasonable basis for the district court's decision." *Transgo, Inc. v. Ajac Transmission Parts Corp.,* 768 F.2d 1001, 1021–22 (9th Cir.1985). The key issue is whether, in the circumstances of this case, the combination of the ban and disclaimer is "sufficient to avoid substantially the risk of consumer confusion." *Home Box Office, Inc. v. Showtime/The Movie Channel,* 832 F.2d 1311, 1315 (2d Cir. 1987).

Although some studies have suggested that disclaimers have little or no effect in preventing consumer confusion, *see id.* at 1315–16 (reviewing literature), we have approved their use in a variety of circumstances.[8] *See, e.g., Taylor Wine Co. v. Bully Hill Vineyards, Inc.,* 569 F.2d 731, 735–36 (9th Cir. 1978); *Friend v. H.A. Friend and Co.,* 416 F.2d 526, 534 (9th Cir.1969). The rationale of those cases applies here. Each involved a defendant who had a substantial interest in continued use of the mark, either because of past investment that had built up goodwill or because of the defendant's interest in using its own name. *Friend,* 416 F.2d at 534 (use of own name); *Taylor,* 569 F.2d at 735–36 (same); *see also Everest & Jennings, Inc. v. E. & J. Mfg. Co.,* 263 F.2d 254, 260–61 (9th Cir.1958) (finding that district court had erred by issuing absolute injunction where defendant had built up mark in good faith). Similarly, Adry–Mart acquired the "Adray's" mark in good faith and invested heavily to create goodwill in the mark.

---

6.  The factor of good faith and intent is ambiguous. Lou Adray points to no evidence that Adry–Mart initially purchased and adopted the "Adray's" mark in bad faith, but Adry–Mart opened the Lakewood store only five miles from Orange County after the litigation began and twice violated the court order barring advertising of that store in Orange County.

7.  Adry–Mart was allowed to advertise if 60% of the medium was within its market, while Adray could advertise in media with 66% of their circulation in his market.

8.  The district court mitigated the problem of fine print disclaimers by specifying the size of the disclaimer in relation to the size of the mark in a given advertisement, *see International Kennel Club v. Mighty Star, Inc.,* 846 F.2d 1079, 1093 (7th Cir.1988), and increased the effectiveness of the disclaimer by providing that it had to appear in "close proximity" to the most prominent display of the potentially confusing mark, *see Home Box Office, Inc.,* 832 F.2d at 1315.

The district court had an additional equitable reason for formulating a less than total prohibition on Adry–Mart's use of the "Adray's" mark in Orange County: Orange County and Los Angeles form essentially one metropolitan area, so an injunction against advertising in any medium with some circulation in Orange County would probably require Adry–Mart to change its mark. Moreover, a plaintiff's unclean hands weighs in the equitable balance that underlies the design of a remedy, *see Republic Molding Corp. v. B.W. Photo Utilities,* 319 F.2d 347, 350 (9th Cir.1963), and the judge found Lou Adray had changed his logo to make it virtually identical with that of Adry–Mart.

Lou Adray's challenge to the specific percentages at which each party is banned from advertising raises a closer issue. Initially, the district court banned advertising unless 66% of the medium's circulation was within the advertising party's market area. Adry–Mart asked for reconsideration because this ban would prevent it from advertising in the *Los Angeles Times,* the premier medium for print advertising in the Los Angeles County area. The district court modified the order to permit Adry–Mart to advertise if 60% of the circulation was within its market, but left Adray's percentage unchanged. The record contains no explanation for drawing a line at either 60 or 66 percent. Nor is there any evidence as to what other print media and radio, broadcast, and cable channels each party will be able to utilize. Accordingly, on remand, after the court determines the area in which Adry–Mart has established secondary meaning, *see supra* part III.A, the court should reconsider the circulation percentages at which each party will be permitted to advertise, in light of the effect the injunction will have on each party's ability to utilize various advertising media, and the court should state the rationale underlying the selection of the percentage it determines to be appropriate.

Costs are to be awarded to the appellants.

AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.