ECHO DRAIN,

v.

Jason NEWSTED, et al.

No. CV024568JFW(FMOX).

United States District Court,
C.D. California.

Filed June 11, 2002.

Aug. 29, 2003.

Allen Hyman, Allen Hyman Law Offices, North Hollywood, CA, Morris S Getzels, Morris S Getzels Law Offices, Tarzana, CA, for Echo Drain, a partnership, plaintiff.

Jill M Pietrini, Jonathan Michael Eisenberg, Robert Roy Begland, Manatt Phelps & Phillips, Los Angeles, CA, for Jason Newsted, an individual, defendant.

WALTER, District Judge.

On July 15, 2003, Defendants Jason Newsted, Echobrain, and Chophouse Records, Inc. (collectively "Defendants") filed a Motion For Summary Judgment Of All Plaintiff's Claims. On August 11, 2003, Plaintiff Echo Drain filed its Opposition. On August 18, 2003, Defendants filed a Reply. The Motion came for hearing on August 25, 2003. After hearing oral argument on the Motion, the Court took the matter under submission. After reviewing the moving, opposing, and reply papers and hearing oral argument, the Court rules as follows:

## I. *Facts And Procedural Background*

On June 11, 2002, Echo Drain filed a complaint against Jason Newsted, Echobrain, and Chophouse Records, Inc. On October 4, 2002, Echo Drain filed a first amended complaint ("FAC"), alleging nine claims for relief: (1) Reverse confusion under the Lanham Act; (2) Violation of 15 U.S.C. § 1125(d)(1)(a) (cybersquatting); (3) False designation of origin; (4) Trademark disparagement; (5) Common law trademark infringement; (6) Violation of California Unfair Trade Practices Act; (7) Unfair competition; (8) Dilution of mark and injury to business reputation; and (9) Declaratory relief.

Defendants originally noticed their summary judgment motion for hearing on the Court's August 4, 2003 calendar. On July 17, 2003, Echo Drain filed an ex parte

application to continue the hearing. In order to give Echo Drain ample time to respond to the summary judgment motion, the Court granted Echo Drain's ex parte application and continued the hearing on Defendants' summary judgment motion to August 18, 2003. On July 28, 2003, Echo Drain filed a second ex parte application to continue the hearing on Defendants' summary judgment motion. On July 30, 2003, the Court again granted Echo Drain's ex parte application for a continuance and continued the motion for summary judgment to August 25, 2003.

### A. *Echo Drain*

Echo Drain is a band that was formed in Texas by Andrew C. Libert, Richard Walker, Todd Visentine, and Jesse Hall. (UF ¶ 103.) Libert, Walker, Visentine, and Hall adopted "Echo Drain" as the name of their band in February 2000. (UF ¶ 110.) Echo Drain's music can be described as progressive funk and groove with elements of heavy metal. (UF ¶ 168.) In March 2000, Echo Drain recorded its first compact disk at Crystal Clear Sound in Dallas, Texas. (UF ¶ 112.) Crystal Clear Sound "pressed" one-hundred copies of Echo Drain's first compact disk, which included three musical compositions entitled Mother Mirror, Sucker Punch, and Secret. (UF ¶ 112 & 114.) In April 2000, Echo Drain began giving away copies of its first compact disk to club owners in the Dallas–Fort Worth, Texas area. (UF ¶ 113.)

On May 25, 2000, Echo Drain performed live for the first time at a club called "The Rock" in the Deep Ellum area, which is about a six to seven block area in Dallas, Texas. (UF ¶¶ 18 & 117.) Thereafter, between May 2000 and September 2002, Echo Drain performed nineteen live shows at various clubs in the Deep Ellum area. (UF ¶ 125.) Echo Drain has never performed live outside of Texas, and Echo Drain band members admit that Echo Drain is a local act, not a national act. (UF ¶¶ 7 & 19.)

Four of Echo Drain's shows were advertised in the Dallas Observer, a free newspaper in the Dallas, Texas area. (UF ¶ 138.) Prior to each of its shows, Echo Drain printed approximately 350 flyers and distributed them to music equipment stores, clubs, and coffee shops and posted them on telephone poles and newspaper boxes in the Dallas–Fort Worth, Texas area. (UF ¶ 120–121.) Beginning in June 2000, Echo Drain distributed bumper stickers with the designation "Echo Drain.com." (UF ¶ 137.) During its shows, Echo Drain distributed t-shirts and candy coins with the name "Echo Drain." (UF ¶ 122.) In 2001, Echo Drain recorded its second compact disk at Master Labs Dallas Recording Studio in Dallas, Texas. (UF ¶ 143.) Echo Drain "pressed" approximately 1,000 copies of its second compact disk. (UF ¶ 144.) Echo Drain sold a few copies of its second compact disk and gave away the remaining copies at clubs and musical instrument stores in the Dallas–Fort Worth, Texas area. (UF ¶ 147.)

In June 2000, Echo Drain created a website with the domain name "Echo-Drain.com." (UF 156.) The website provided news about the band and pictures of the band members. (UF ¶ 159.) The website also allowed visitors to download Echo Drain recorded performances and allowed visitors to post messages. (UF ¶ 159.)

Echo Drain has never had a booking agent, promoter, personal manager, business manager, fan club, or roadies. (UF ¶¶ 16, 17, & 43.) Echo Drain does not have a recording contract or a merchandising contract, nor has any merchandising company or record company ever offered Echo Drain a contract. (UF ¶¶ 3 & 26.) The gross revenue from all of Echo

Drain's live performances was $200. (UF ¶ 10.)

### B. *Echobrain*

Echobrain is a pop rock band that was formed by Jason Newsted, Brian Sagrafena, and Dylan Donkin. (UF ¶ 46.) Newsted is a well-known rock musician in the United States, having been a member of the well-known band Metallica. (UF ¶ 184.) Newsted is also the president and owner of Chophouse Records, Inc. (UF ¶ 244.) Newsted and Donkin adopted "Echobrain" as the name of their band in October 1999. (Newsted Decl. ¶ 5.) Echobrain's music has been described as "melodious pop rock," even "Beatiesque." (UF ¶ 68.)

In April 2000, Echobrain began recording music in a recording studio in the San Francisco, California area. (Newsted Decl. ¶ 8; Exh. B to Newsted Decl.) On April 19, 2000, Echobrain submitted a DAT recording of a collection of songs to the United States Copyright Office titled "Chimera—Echobrain." (Exh. J to Pietrini Decl.; Exh. G to Newsted Decl,; Newsted Decl. ¶ 10.) Defendants learned of Echo Drain for the first time during the first week of May 2000. (UF ¶ 56.)

On June 25, 2001, Echobrain mailed promotional compact disks to several individuals and radio stations. (Exh. B to Hyman Decl.) On August 19, 2001, Echobrain performed live for the first time at Nadine's Wild Weekend in San Francisco, California. (UF ¶ 180.) In May 2002, Echobrain released an album under the Chophouse Records, Inc. record label. (Exh. 1 to Hyman Decl.) Echobrain has sold albums, toured the country, used standard music industry marketing channels such as radio play and compact disk stores. (UF ¶ 48.) Echobrain also has a website with the domain name "echobrain.com." Echobrain ceased to exist on June 11, 2002. (UF ¶ 248.)

### II. *Standard*

Summary judgment is proper where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The moving party has the burden of demonstrating the absence of a genuine issue of fact for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A party opposing a properly made and supported motion for summary judgment may not rest upon mere denials but "must set forth specific facts showing that there is a genuine issue for trial." Fed. R.Civ.P. 56(e). in particular, when the non-moving party bears the burden of proving an element essential to its case, that party must make a showing sufficient to establish a genuine issue of material fact with respect to the existence of that element or be subject to summary judgment. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

An issue is genuine if evidence is produced that would allow a reasonable jury to reach a verdict in favor of the non-moving party. *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505. The Court must assume the truth of direct evidence set forth by the opposing party. *See Hanon v. Dataproducts Corp.* 976 F.2d 497, 507 (9th Cir. 1992). However, where circumstantial evidence is presented, the Court may consider the plausibility and reasonableness of inferences arising therefrom. *See Anderson*, 477 U.S. at 249–50, 106 S.Ct. 2505; *TW Electrical Service, Inc. v. Pacific Electrical Contractors Ass'n*, 809 F.2d 626, 631–32 (9th Cir.1987). In that regard, "a mere 'scintilla' of evidence will not be sufficient to defeat a properly supported motion for summary judgment; rather, the

nonmoving party must introduce some significant probative evidence tending to support the complaint." *Summers v. Teichert & Son, Inc.,* 127 F.3d 1150, 1152 (9th Cir.1997) (internal quotations omitted).

In ruling on a summary judgment motion, "the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson* 477 U.S. at 249, 106 S.Ct. 2505. Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions ..." *Id.* at 255, 106 S.Ct. 2505.

### III. *Discussion*

■ Echo Drain's FAC alleges claims for federal trademark infringement, as well as state statutory and common law claims. During oral argument, Echo Drain agreed that if the Court entered an order granting summary judgment on Echo Drain's federal trademark infringement claims, it would be dispositive of the remaining claims in Echo Drain's FAC with the exception of Echo Drain's claim for cybersquatting. *See, e.g., Glow Industries, Inc. v. Lopez,* 252 F.Supp.2d 962, 975 n. 90 (C.D.Cal.2002) (noting that "[t]he standard for Lanham Act unfair competition is the same as that for Lanham Act trademark infringement" and "the elements of state claims for trademark infringement and unfair competition are substantially similar to those of the comparable federal claims"). In order to prevail on its federal trademark infringement claims, Echo Drain must prove that it has a valid protectable trademark and that Defendants' use of the same or similar

mark caused a likelihood of confusion in the minds of the relevant consuming public.[1] *Fuddruckers, Inc. v. Doc's B.R. Others, Inc.,* 826 F.2d 837, 841 (9th Cir.1987).

#### A. *Echo Drain Does Not Have A Protectable Trademark.*

■ Pursuant to 15 U.S.C. § 1115(a), a valid federal trademark registration constitutes *prima facie* evidence that the holder owns the mark and has the exclusive right to use the mark in connection with the goods or services specified in the registration. *KP Permanent Make–Up, Inc. v. Lasting Impression I, Inc.,* 328 F.3d 1061, 1069 (9th Cir.2003). It is undisputed that Echo Drain has not obtained a federal trademark registration for the Echo Drain mark. (UF ¶ 24.) Because Echo Drain has not obtained a federal trademark registration, it must prove that the Echo Drain mark is protectable. *Glow,* 252 F.Supp.2d at 976. In order to establish that it has a protectable trademark, Echo Drain must prove (1) that its mark is inherently distinctive or (2) that the mark has acquired distinctiveness through secondary meaning. *See Kendall–Jackson Winery, Ltd. v. E & J Gallo Winery,* 150 F.3d 1042, 1047 (9th Cir. 1998).

■ Marks are often classified in categories of increasing distinctiveness: (1) generic, (2) descriptive, (3) suggestive, and (4) arbitrary or fanciful. *Two Pesos, Inc. v. Taco Cabana, Inc.,* 505 U.S. 763, 768, 112 S.Ct. 2753, 120 L.Ed.2d 615 (1992); *Japan Telecom, Inc. v. Japan Telecom Am. Inc.,* 287 F.3d 866, 872 (9th Cir.2002). Generic terms are not protectable as trademarks because "they are common

---

1. For purposes of this motion, Defendants conceded that Echo Drain was the first to use its mark commercially. (Reply pp. 7–8.) Thus, for purposes of this motion, Echo Drain is the senior user and Defendants are the junior user. *Brookfield Communications, Inc. v. West Coast Entertainment Corp.,* 174 F.3d 1036, 1046 (9th Cir.1999) (noting that "[t]he first to use a mark is deemed the 'senior' user and has the right to enjoin 'junior' users from using confusingly similar marks in the same industry or within the senior user's natural zone of expansion").

words or phrases that describe a class of goods rather than an individual product" and "do not relate exclusively to the trademark owner's product." *Id.* (internal quotations omitted). Descriptive terms relate more directly to a particular product than generic terms because descriptive terms "describe [ ] a person, a place or an attribute of a product." *Id.* However, descriptive terms "suffer from the same problem as generic terms: Because they tend to consist of common words that might be the only way to describe a category of goods, [courts] do not grant exclusive property rights in them Thus, a descriptive term is protectable only if it 'has acquired secondary meaning in the minds of consumers, i.e., it has become distinctive of the trademark applicant's goods in commerce.'" *Filipino Yellow Pages, Inc. v. Asian Journal Publications, Inc.,* 198 F.3d 1143, 1147 (9th Cir.1999) (internal quotations omitted). Marks that are "suggestive" or "arbitrary or fanciful" are protectable without a showing of secondary meaning. *Japan Telecom,* 287 F.3d at 872.

█ On April 3, 2002, Defendants served a request for admissions on Echo Drain which specifically requested that Echo Drain: (1) "Admit that the word 'Echo' has a descriptive meaning when used in conjunction with musical sound recordings;" (2) "Admit that the word 'Echo' has a descriptive meaning when used in conjunction with a musical group;" and (3) "Admit that the word 'Echo' has a descriptive meaning when used in conjunction with entertainment services in the nature of live musical performances." (UF ¶ 92; Exh. F to Pietrini Decl.) It is undisputed that Echo Drain did not timely respond to the request for admissions. (UF ¶ 92.) Failure to timely respond to a party's request for admissions results in automatic admission of the matters requested. Fed.R.Civ.P. 36(a); *see also* William W. Schwarzer et al., *California Practice Guide: Federal Civil Procedure*

*Before Trial* ¶ 11:2070. Although Echo Drain filed a motion to set aside its admissions on July 7, 2003, that motion was denied by Magistrate Judge Fernando M. Olguin. Echo Drain's failure to timely respond to Defendants' request for admissions conclusively establishes that the Echo Drain mark is descriptive. *See U.S. v. Kasuboski,* 834 F.2d 1345, 1350 (7th Cir.1987) (holding that "[a]dmissions made under Rule 36, even default admissions, can serve as the factual predicate for summary judgment"); *see also* Schwarzer, *supra,* at 11:2102 (noting that "[u]nlike admissions made in interrogatory answers or depositions, admissions made in RFAs are binding and *cannot* be explained away or contradicted by other evidence").

Echo Drain offered no expert reports or surveys to prove that the Echo Drain mark has secondary meaning. (UF ¶ 97.) In addition, there is no consumer testimony in this case to indicate that a significant portion of the consuming public associates the Echo Drain mark with the products or services offered by Echo Drain. *See, e.g., Surgicenters of America, Inc. v. Medical Dental Surgeries Co.,* 601 F.2d 1011, 1018 n. 23 (9th Cir.1979); *see also Yellow Cab Co. of Sacramento v. Yellow Cab Co. of Elk Grove,* 266 F.Supp.2d 1199, 1206 (E.D.Cal. 2003) (holding that "there is no genuine issue of material fact remaining for trial as to whether 'yellow cab' has acquired a secondary meaning to the buying public in the Sacramento area"). Because the Echo Drain mark is descriptive and there is no evidence that it has acquired a secondary meaning, the mark is not protectable and the Court grants Defendants' motion for summary judgment.

B. *Even If Echo Drain Could Prove That It Has A Protectable Trademark, No Reasonable Jury Could Find A Likelihood Of Confusion.*

Although the Court granted summary judgment based on Echo Drain's failure to

present evidence that it has a protectable mark, the Court has nonetheless decided to independently consider the motion for summary judgment assuming that Echo Drain has a protectable mark. Unfortunately for Echo Drain, the result is the same because the Court concludes that summary judgment must still be granted on Echo Drain's federal trademark infringement claims because it cannot demonstrate that a genuine issue of material fact exists on the issue of likelihood of confusion.

■ "The test for likelihood of confusion is whether a reasonably prudent consumer in the market place is likely to be confused as to the origin of the good or service bearing one of the marks." *Dreamwerks Production Group, Inc. v. SKG Studio,* 142 F.3d 1127, 1129 (9th Cir. 1998) (internal quotations omitted). In *AMF Inc. v. Sleekcraft Boats,* 599 F.2d 341, 348–49 (9th Cir.1979), the Ninth Circuit identified eight factors that should be considered in determining whether there is likelihood of confusion: (1) the strength of the mark; (2) the proximity or relatedness of the goods; (3) the marks' similarity in appearance, sound, and meaning; (4) evidence of actual confusion; (5) the degree to which the parties' marketing channels converge; (6) the type of goods and the degree of care customers are likely to exercise in purchasing them; (7) evidence of the defendants' intention in selecting and using the allegedly infringing name; and (8) the likelihood that the parties will expand their product lines. "This list of factors, while perhaps exhausting, is neither exhaustive nor exclusive. Rather, the factors are intended to guide the court in assessing the basic question of likelihood of confusion. The presence or absence of

a particular factor does not necessarily drive the determination of a likelihood of confusion." *E & J Gallo Winery v. Gallo Cattle Co.,* 967 F.2d 1280, 1290–91 (9th Cir.1992). During argument, Echo Drain conceded that this is a reverse confusion case.[2] Three *Sleekcraft* factors are pivotal in reverse confusion cases: (1) the strength or arbitrariness of the mark; (2) the relatedness of the parties' goods; and (3) the similarity of the marks. *Dreamwerks,* 142 F.3d at 1129. As discussed in detail below, the application of the *Sleekcraft* factors weighs against finding a likelihood of confusion, and the Court concludes that no reasonable jury could find a likelihood of confusion in this case.

1. *Strength Of The Mark*

a. *Conceptual Strength*

■ In a reverse confusion case, the court evaluates the conceptual strength of the senior user's mark and the commercial strength of the junior user's mark. *Glow,* 252 F.Supp.2d at 987 n. 112. The conceptual strength of a given mark rests on its distinctiveness. *Miss World (UK) Ltd. v. Mrs. America Pageants, Inc.,* 856 F.2d 1445, 1448 (9th Cir.1988). As discussed above, Echo Drain's admissions conclusively establish that the Echo Drain mark is descriptive. However, even without those admissions, Echo Drain's mark would at most be suggestive.[3] A suggestive mark "conveys an impression of a good but requires the exercise of some imagination and perception to reach a conclusion as to the product's nature." *Brookfield Communications,* 174 F.3d at 1058 n. 19. It is clear from the testimony of Echo Drain's band members that, with some imagination and perception, the term Echo Drain con-

---

2. The Court also notes that Echo Drain's Opposition Brief only argues reverse confusion and does not argue forward confusion.

3. Echo Drain failed to address the conceptual strength issue in its Opposition papers and offered no evidence that its mark is arbitrary or fanciful.

veys an impression of the type of music the band performs. For example, Todd Visentine, a current member of Echo Drain testified that the name "Echo Drain" was intended to convey the following image: "[t]he image of swirling sounds, of echoing the various styles of music we create, and maybe a drain that kind of pulls it all together as those echoed sounds our influences, and draining it into water, as a band, as a whole, that we represent—that those sounds represent the defining theme, or the Echo Drain name defines that particular art that we create." (Exh. L to Pietrini Decl.) In addition, Echo Drain's former band member, Ines Infante, testified that the term Echo Drain conveys the following meaning: "The meaning [is] ... basically the eternal sound of the drain and the echo that would be continuous." (Exh. K to Pietrini Decl.) (internal quotations omitted). Because the Echo Drain mark has an intrinsic connection with Echo Drain's music, the mark is suggestive at best. *See Brookfield Communications,* 174 F.3d at 1058 n. 19 (noting that "[a]rbitrary or fanciful marks have *no intrinsic connection* with the product with which the mark is used").

Although suggestive marks are protectable, it is presumed that they are conceptually weak. *Brookfield Communications,* 174 F.3d at 1058 (noting that "[w]e have recognized that, unlike arbitrary or fanciful marks which are typically strong, suggestive marks are presumptively weak"); *see also Accuride Intern., Inc. v. Accuride Corp.,* 871 F.2d 1531, 1536 (9th Cir.1989) ("Arbitrary and fanciful marks are strong, while suggestive and descriptive marks are weak"). Because the Echo Drain mark is suggestive, the mark is presumptively weak and Echo Drain should have anticipated some confusion with legitimate competitors, such as Echobrain. *Dreamwerks,* 142 F.3d at 1130 (noting that "[h]ad Dreamwerks chosen a descriptive mark, like Sci-Fi Conventions Inc., or a sugges-

tive mark like Sci-Fi World, some confusion with legitimate competitors might be expected"); *see also Glow,* 252 F.Supp.2d at 987 (holding that because the Glow mark is suggestive, "Glow, Inc .... cannot claim broad protection for its mark, and should have anticipated some confusion with legitimate competitors as a consequence").

In addition, the large number of third parties in the music industry that use the word "echo" further dilutes the strength of Echo Drain's already presumptively weak mark. *See Franklin Resources, Inc. v. Franklin Credit Mgmt. Corp.,* 988 F.Supp. 322, 328 (S.D.N.Y.1997) (holding that "[i]t is well established that third-party registration and use dilutes the strength of a trademark"). It is undisputed that more than 500 other music groups use the term "echo" in their names, album titles, and song titles. (*See* Exh. A—1 to Jones Decl.; Jones Decl. ¶¶ 7–16; Helsing Decl. ¶¶ 2–8; Burke Decl. ¶¶ 1–12; LeBario Decl. ¶¶ 2–9; and Watkins Decl. ¶¶ 2–10.) One music group even has a song titled "Echodrain." (Exh. E. to Jones Decl.) Thirteen bands in Texas alone have names containing the word "echo," and Echo Drain even performed live at a club in Deep Ellum with another "echo" band named Echojar. (Exh. C to Jones Decl.; UF ¶ 75.)

b. *Commercial Strength*

■ In a reverse confusion case, the senior user's mark is typically commercially weaker than the junior user's mark. *Cohn v. Petsmart, Inc.,* 281 F.3d 837, 841 (9th Cir.2002). Thus, in a reverse confusion case, a court should "evaluate the strength of the junior user's mark so as to gauge its ability to overpower the senior user's mark." 3 J. McCarthy, *McCarthy On Trademarks And Unfair Competition* § 23:10; *see also Glow,* 252 F.Supp.2d at

987 n. 112. In a reverse confusion case, the court considers two factors while analyzing commercial strength: "(1) the commercial strength of the junior user as compared to the senior user; and (2) any advertising or marketing campaign by the junior user that has resulted in a saturation in the public awareness of the junior user's mark." *A & H Sportswear, Inc. v. Victoria's Secret Stores, Inc.*, 237 F.3d 198, 231 (3d Cir.2000). Although Echo Drain presented evidence that Defendants' mark is commercially stronger, this does not end the analysis of this *Sleekcraft* factor because the Court must compare the commercial strength of the Defendant's mark with the conceptual strength of the Echo Drain mark.

c. *Comparing Commercial Strength And Conceptual Strength*

The key question in reverse confusion cases is whether consumers who encounter the senior user's products will believe that they are associated with the junior user. *See Walter v. Mattel, Inc.*, 210 F.3d 1108, 1110 (9th Cir.2000). Because the Echo Drain mark is presumptively weak and there are numerous other music bands in the market that use the word "echo," the strength of the mark factor weighs in favor of Defendants. *See Glow*, 252 F.Supp.2d at 991–92 (holding that "while defendants' commercial strength is likely to overwhelm plaintiff in the marketplace to the extent that their products compete, the court concludes that Glow, Inc. will not likely be able to prove that the strength of the mark factor favors a finding of likelihood of confusion because its own mark is conceptually weak and operates in a crowded field").

2. *Proximity Or Relatedness Of The Goods*

"When two products or services fall within the same general field, it does not mean that the two products or services are sufficiently similar to create a likelihood of confusion." *Harlem Wizards Entertainment Basketball, Inc. v. NBA Properties, Inc.*, 952 F.Supp. 1084, 1095 (D.N.J.1997). Although Echo Drain and Echobrain are both music bands, it is undisputed that they play different types of music: Echobrain's music is described as pop rock, while Echo Drain's music is described as progressive funk and groove with elements of heavy metal. (UF ¶¶ 68 & 168.) Echo Drain offers no evidence that customers that listen to "funk and groove" or "heavy metal" music are the same customers that listen to "pop rock" music. Rather, the deposition testimony of Todd Visentine, a member of Echo Drain, suggests exactly the opposite: Echo Drain and Echobrain play at different types of clubs and cater to different types of customers. Visentine testified that at least one club in the Dallas–Fort Worth area booked Echobrain but refused to book Echo Drain because "they don't book heavy metal acts." (Exh. A to Supp. Pietrini Decl.) Accordingly, the proximity or relatedness of the goods factor weighs in favor of Defendants.

In a factually similar case, Judge Newman in the Southern District of New York addressed the proximity or relatedness of goods factor as follows:

Sunenblick's products are addressed to a somewhat esoteric market, viz., purchasers interested in lost or forgotten jazz artists, in the "straight ahead jazz" category, whereas defendants sell rap recordings. The record favors defendants in this regard. Although the products are sold in the same channels of trade, they are not sold side-by-side; rather, they are featured in different sections of the stores in which they are sold, according to genre and not by label name. (R. 687–88; 690–91). Hence, absent any evidence that consumers of one will be potential consumers of the other, it is most likely that the consumer entering a

record store with the intention of purchasing one of Dr. Sunenblick's products would not even see defendants' products, much less the trademarks appearing thereon. *Sunenblick v. Harrell,* 895 F.Supp. 616, 629 (S.D.N.Y.1995).

### 3. *Similarity Of The Marks*

"Similarity of the marks is tested on three levels: sight, sound, and meaning." *Sleekcraft,* 599 F.2d at 351. In this case, the two marks look different and appear different in the marketplace. The two marks look different because the Echo Drain mark consists of two words, whereas the Echobrain mark contains only a single word. The two marks are presented with distinctive fonts. Defendants predominantly present the Echobrain mark as if each letter has been stamped on the page, with the "o" being stamped twice and the ink not completely filling in each letter. (UF ¶ 80.) The Echo Drain mark, on the other hand, has been presented in a variety of different fonts, but never in the same font as the Echobrain mark. (*See* Exhs. L & K to Pietrini Decl.; Exhs. 2–16 to Andrew Libert Decl.). Moreover, it is clear from the testimony in the record that Echo Drain and Echobrain have two different meanings. Echo Drain refers to the echo coming from or swirling down a drain, while Echobrain refers to the echos in the brain of a musically creative person. (Exhs. K & L to Pietrini Decl.; Newsted Decl. ¶ 5.) Because "-brain" and "Drain" are different words and are phonetically different, the two marks also sound different. Accordingly, the similarity of the marks factor weighs in favor of Defendants.

### 4. *Evidence Of Actual Confusion*

Echo Drain offers no expert reports or surveys to prove that there is a likelihood of confusion between Echo Drain and Echobrain. (UF ¶ 97.) Rather, Echo Drain's evidence of actual confusion consists of four letters from friends and a few unauthenticated e-mails and postings to its website. (Exhs. 19–4 & 20–23 to Andrew Libert Decl.; Exh. 2 to Visentine Decl.) The four letters from friends of Echo Drain band members are not probative of actual confusion. *See, e.g., Japan Telecom,* 287 F.3d at 874; *Pump v. Collins Management, Inc.,* 746 F.Supp. 1159, 1170 (holding that "[w]hile the fact that ... these incidents involved [friends of Ganci's] does not make [them] less relevant, it does make their testimony less probative of actual confusion"). Moreover, the few unauthenticated e-mails and webpostings standing alone are not sufficient evidence of actual confusion. *See Cohn v. Petsmart,* 281 F.3d 837, 843 n. 7 (9th Cir.2002) (holding that "Cohn received several dozen inquiries over the years about whether the parties were related. Without some other evidence of actual confusion, however, these inquiries are too ambiguous to demonstrate actual confusion"); *see also* J. McCarthy, 3 *McCarthy On Trademarks And Unfair Competition* § 23:16 (noting that "while enquiry evidence is admissible and relevant, standing alone with no other evidence it is insufficient proof of actual confusion"). In fact, several of the website postings relied on by Echo Drain express the opinion that the Echo Drain and Echobrain marks are so different that Echo Drain will not prevail on its trademark claims. For example, one posting states: "Looking to cash in on Jason Newsted / Echo Brain! Do you really think people are gonna confuse you? ? ?" In addition, none of the evidence offered by Echo Drain suggests that members of the buying public would *mistakenly purchase* an Echo Drain product believing it was an Echobrain product or vice versa. *See Sunenblick v. Harrell,* 895 F.Supp. 616, 631 (S.D.N.Y.1995) (noting that "the relevant confusion to be avoided is that which affects purchasing decisions, not confusion

generally"). Accordingly, the actual confusion factor decisively weighs in favor of Defendants.

### 5. Evidence Of The Defendants' Intention In Selecting And Using The Allegedly Infringing Name

"A defendant's intent to confuse or deceive consumers as to the product's source may be highly probative of likelihood of confusion." *A&H Sportswear, Inc. v. Victoria's Secret Stores, Inc.,* 237 F.3d 198, 232 (3d Cir.2000). A "defendant's Intent may be discovered through such inquiries as whether the defendant was aware of the senior user's mark when it adopted its own mark, and whether the defendant considered that its adoption of the mark might result in confusion." *Id.; see also Glow,* 252 F.Supp.2d at 1002 (noting that "[k]nowing adoption of a mark closely similar to another is a sound basis for inferring an intent to deceive"). "Generally, in the reverse confusion context, it is not likely that there will be evidence defendant intended to adopt the senior user's mark." *Glow,* 252 F.Supp.2d at 1002.

In this case, it is undisputed that Newsted and Donkin adopted the name "Echobrain" for their band as early as October 1999 and began using the Echobrain mark as early as April 2000. (Newsted Decl. ¶ 5; Exh. B to Newsted Decl.) It is also undisputed that Defendants did not learn of Echo Drain until May 2000. (UF ¶ 56.) Because Defendants' adopted the Echobrain mark before learning of Echo Drain's existence, there is no evidence that Defendants intended to promote confusion between Echo Drain and Echobrain products or appropriate Echo Drain's good will. *See, e.g., Tsiolis v. Interscope Records, Inc.,* 946 F.Supp. 1344, 1354 (N.D.Ill.1996) (finding no intent to confuse because "Dr. Dre thought of the name 'Aftermath' before he had ever learned of the Band's existence"). Accordingly, the intent factor decisively weighs in favor of Defendants.

### 6. The Degree To Which The Parties' Marketing Channels Converge, The Type Of Goods And The Degree Of Care Customers Are Likely To Exercise In Purchasing Them. And The Likelihood That The Parties Will Expand Their Product Lines

Because the balance of the *Sleekcraft* factors are only marginally helpful to the analysis of the likelihood of confusion issue, the Court finds it unnecessary to discuss each of the remaining factors. *Downing v. Abercrombie & Fitch,* 265 F.3d 994, 1008 (9th Cir.2001) (holding that "[a]lthough these are all factors that are appropriate for consideration in determining the likelihood of confusion, they are not necessarily of equal importance, nor do they necessarily apply to every case"); *Alberto–Culver Co. v. Trevive, Inc.,* 199 F.Supp.2d 1004, *1009 (C.D.Cal.2002) (noting that "[t]he likelihood of confusion analysis considers all ... factors for which there is evidence in the record but 'may focus ... on dispositive factors, such as similarity of the marks and relatedness of the goods' "). However, based on the undisputed evidence in the record, the Court finds that these factors weigh in favor of Defendants.

### C. Even If Echo Drain Could Prove That It Has A Protectable Trade Mark And There Is A Likelihood Of Confusion, Echo Drain's Rights In Its Mark Are Limited To The Dallas–Fort Worth Area.

A senior user of a trademark is entitled to assert its trademark rights in all areas in which it has legally sufficient market penetration and a zone of natural expansion. *Tally–Ho, Inc. v. Coast Community College Dist.,* 889 F.2d 1018, 1027 (11th Cir.1989); *see also Glow,* 252 F.Supp.2d at 983–84. "The extent of market penetration depends upon the volume of sales, the positive and negative growth

trends, the number of people who purchased the party's goods in relation to the number of potential customers, and the amount of advertising." *Adray v. AdryMart, Inc.,* 76 F.3d 984, 989 (9th Cir.1995).

It is undisputed that Echo Drain has never performed live outside of Texas. (UF ¶ 7.) It is also undisputed that Echo Drain band members characterize Echo Drain as a local act, not a national act. (UF ¶ 19.) In addition, Echo Drain offers no evidence that it took affirmative steps or entertained realistic plans of expansion beyond the Dallas–Fort Worth area. *See Blue Ribbon Feed Co., Inc., v. Farmers Union Central Exchange, Inc.,* 731 F.2d 415, 422. Although Echo Drain has a website, Echo Drain offers no evidence that people outside of the Dallas–Fort Worth area have accessed the website, downloaded performances from the website, or even posted messages to the website. *Id.* (holding that "BFR's mere hope of expansion is insufficient to support the protection sought"). Echo Drain even concedes that although its website is accessible in California, it has no plans to do any business in California. (UF ¶ 36.) Accordingly, even if Echo Drain was able to prove that it had a protectable trademark, its rights in that mark would not extend beyond the Dallas–Fort Worth, Texas area.

D. *Even If Echo Drain Could Prove That It Has A Protectable Trademark, Echo Drain Could Not Prevail On Its Cybersquatting Claim Because It Offers No Evidence That Defendants Had A Bad Faith Intent To Profit.*

In order to prevail on a claim for cybersquatting, Echo Drain must prove that Defendants registered a domain name that is identical or confusingly similar to the Echo Drain mark and that Defendants had a "bad faith intent to profit from that mark." 15 U.S.C. § 1125(d)(1)(A)(i). Al-

though Newsted registered the internet domain names echodrain.net and echodrain.org on April 10, 2001, it is undisputed that: (1) Newsted never intended to profit from using the domain names; (2) Newsted never offered the domain names for sale to anyone, including Echo Drain; (3) Newsted never used the domain names to promote Echobrain or attack Echo Drain; and (4) Newsted abandoned ownership of the domain names on July 28, 2002. (UF ¶ 99; Newsted Decl. ¶ 23.) Accordingly, Echo Drain cannot prevail on its cybersquatting claim because there is no evidence that Defendants had a bad faith intent to profit from the Echo Drain mark by registering the echodrain.net or echodrain.org domain names.

### IV. *Conclusion*

For the forgoing reasons, the Court **GRANTS** Defendants' motion for summary judgment on all of the claims alleged in the First Amended Complaint. The Court will not enter judgment in this action until the Defendants' pending counterclaims are resolved.

IT IS SO ORDERED.

The Clerk shall serve a copy of this Minute Order on all parties to this action.